[No. 57765-0. En Banc. June 10, 1993.]

ROBERT PATRICK GUIMONT, ET AL, *Respondents*, v. CHUCK CLARKE, *Appellant*, WASHINGTON MANUFACTURED HOUSING ASSOCIATION, ET AL, *Respondents*.

*Christine O. Gregoire, Attorney General,* and *John J. Ryan, Assistant,* for appellant.

*John D. Blankinship, Jerry W. Spoonemore, Joseph C. Brown, Jr.,* and *Montgomery, Purdue, Blankinship & Austin,* for respondents Guimont.

*Russell A. Austin* and *Kargianis, Austin & Osborn,* for respondent Washington Manufactured Housing Association.

*Jane Ryan Koler* and *Casey & Pruzan,* for respondent Bear Creek Associates.

*Norm Maleng, Prosecuting Attorney for King County,* and *Michael Joseph Sinsky, Deputy,* on behalf of King County, amicus curiae for appellant.

*Mark H. Sidran, Seattle City Attorney,* and *Hugh R. Tobin, Assistant; Martin F. Muench, Puyallup City Attorney,* on behalf of Washington State Association of Municipal Attorneys, amicus curiae for appellant.

*David B. Girard* on behalf of Evergreen Legal Services, amicus curiae for appellant.

*Ronald A. Zumbrun, Robin L. Rivett, John M. Groen, Benjamin J. Gantt, Jr.,* and *Richard M. Stephens* on behalf of Pacific Legal Foundation, amicus curiae for respondents.

JOHNSON, J. — The issue in this case is the constitutionality of the Mobile Home Relocation Assistance Act, RCW 59.21, as amended in 1990. *See* Laws of 1989, ch. 201; Laws of 1990, ch. 171. When a mobile home park is closed, this law requires the park owner to contribute money toward the tenants' relocation costs. The Thurston County Superior Court struck down the law as unconstitutional under a number of different theories. We affirm on the grounds that the law violates the park owners' substantive due process rights.

## I
### BACKGROUND

Mobile home park residents generally own their own mobile homes, but they lease from the park owner the "pads" upon which the mobile homes rest. Because of their dual capacities as owners and renters, these residents face particularly dif-

ficult financial burdens when parks are closed. *See* Note, *Mobilehomes: Present Regulation and Needed Reforms*, 27 Stan. L. Rev. 159, 166-67 (1974-1975). When forced to relocate from a closing park, these residents face the expensive task of moving not only themselves but also their homes to other sites. In fact, relocation costs often represent "a significant fraction of the value of the mobile home itself". *Yee v. Escondido*, ___ U.S. ___, 118 L. Ed. 2d 153, 162, 112 S. Ct. 1522 (1992); *see also* Baar, *The Right to Sell the "Im"mobile Manufactured Home in Its Rent Controlled Space in the "Im"mobile Home Park: Valid Regulation or Unconstitutional Taking?*, 24 Urb. Law. 157, 158 (1992); Manheim, *Tenant Eviction Protection and the Takings Clause*, 1989 Wis. L. Rev. 925, 955 n.179 (1989). Typically, the transportation costs amount to several thousand dollars, and the setup costs can be $10,000 for a double-wide home. Baar, 24 Urb. Law. at 170-71. Many of the tenants of these mobile home parks are not in a financial position to afford these relocation costs. *See* Laws of 1991, ch. 327, § 8. As the Legislature has specifically found, "manufactured housing and mobile home parks provide a source of low-cost housing to the low income, elderly, poor and infirmed, without which they could not afford private housing . . .." RCW 59.22.010(1)(a); *see also* Manheim, 1989 Wis. L. Rev. at 955 n.179.

In response to this problem, the Legislature passed the Mobile Home Relocation Assistance Act (Act) in 1989, and amended the Act in 1990.[1] Laws of 1989, ch. 201; *see* Laws of 1990, ch. 171. The Act generally requires the owner of a mobile home park to pay relocation assistance to the park's tenants if the owner wants to close the park or convert it to another use. Laws of 1990, ch. 171, § 2(1). Tenants are entitled to $4,500 for single-wide mobile homes and $7,500 for mobile homes double-wide or larger. Laws of 1990, ch. 171, § 2(1).

---

[1] The Legislature amended the Act again in 1991. *See* Laws of 1991, ch. 327. The 1991 amendments are not at issue in this case, and the parties have not presented any argument as to their effect. Regardless, the amendments do not appear to substantially change the Act and do not affect our analysis in this case.

For relocations occurring prior to July 1, 1991, the park owners generally were required to pay the full amount of these assistance amounts. Laws of 1990, ch. 171, § 2(2). Beginning with relocations occurring after June 30, 1991, the payment of relocation assistance depends in part on whether the tenant is low income. When a low income tenant is forced to relocate after June 30, 1991, the assistance cost is paid one-third by the park owner and two-thirds by the mobile home relocation fund. Laws of 1990, ch. 171, § 2(3). When a low income tenant is forced to relocate after July 1, 1992, assistance payments depend on the relocation notice that was provided. If the park owner gives 24 months' notice, then the park owner pays $500 for a single-wide mobile home and $1,000 for a double-wide or larger mobile home, and the relocation fund pays the balance. If the park owner gives less than 24 months' notice, then the park owner pays one-third of the assistance cost and the relocation fund pays two-thirds. Laws of 1990, ch. 171, § 2(4).

The park owner becomes responsible for paying up to the full amount of the assistance obligations if "there are insufficient moneys in the [relocation] fund . . .." Laws of 1990, ch. 171, § 2(6). Tenants who do not qualify as low income are not entitled to receive any assistance from the relocation fund. However, the park owners must still pay these tenants the same amount the owners are required to pay directly to low income tenants. Laws of 1990, ch. 171, § 2(7).

The relocation fund is in the custody of the State Treasurer and is administered by the Department of Community Development. Laws of 1990, ch. 171, § 5(1), (4). The relocation fund may be used only for paying mobile home relocation assistance, although certain surplus funds may be transferred to the mobile home park purchase fund established in RCW 59.22. Laws of 1990, ch. 171, § 5(1), (2). The relocation fund may receive money from three sources. Laws of 1990, ch. 171, § 5(1). First, the Legislature may directly appropriate money for the fund, although there is no evidence the Legislature has yet done so. Second, the Legislature in 1990 enacted a $65 fee on transactions transferring mobile home

ownership, $50 of which goes to the relocation fund. Laws of 1990, ch. 171, § 6(1). Third, a park owner who owes assistance to low income tenants pays the assistance to the relocation fund, and the fund then distributes the assistance to the low income tenants.

A group of park owners sued the Director of the Department of Community Development (Department) in Thurston County Superior Court. They sought a declaratory judgment that the Act was unconstitutional and requested a permanent injunction against enforcement of the Act by the Department. The park owners did not seek monetary damages.

The Superior Court granted summary judgment in favor of the park owners and struck down the Act as unconstitutional. The court ruled the Act violated the park owners' constitutional right prohibiting the taking of property without just compensation and violated the park owners' rights to due process and equal protection. The court permanently enjoined the Department from enforcing the Act.

The Department appealed to the Court of Appeals. The Court of Appeals partially stayed the Superior Court's injunction. The appeal was transferred to this court pursuant to RAP 4.3.

## II
### ISSUES

At issue in this case is the constitutionality of requiring mobile home park owners to pay a portion of their tenants' relocation costs when the owners convert their parks to some other use. Specifically, does the Act result in private property being taken for public use, requiring the payment of just compensation under the Fifth and Fourteenth Amendments? Also, does the Act deprive the park owners of property without due process of law in violation of the Fourteenth Amendment?

## III
### ANALYSIS

The analytical framework for resolving these issues was developed in *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d

238, 111 S. Ct. 284 (1990). A land use regulation may be challenged either as an unconstitutional taking or as a violation of substantive due process. *Presbytery*, 114 Wn.2d at 329. If the regulation is challenged on both grounds, under our *Presbytery* framework, we begin by analyzing the takings issue. The court first asks two threshold questions to determine if a regulation is susceptible to a takings challenge. If the regulation passes this threshold inquiry, the court proceeds to a takings analysis. However, if the regulation survives the takings analysis, the court then determines whether the regulation violates substantive due process. *Presbytery*, 114 Wn.2d at 330; *Robinson v. Seattle*, 119 Wn.2d 34, 50, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992). Of course, nothing precludes a challenge to a land use regulation solely on either rather than on both constitutional grounds.

We subsequently refined and applied the *Presbytery* analysis in *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765, *cert. denied*, 121 L. Ed. 2d 598 (1992) and *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992). Subsequent to oral argument in this case, however, the United States Supreme Court issued a takings decision in *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992), and supplemental briefing on *Lucas* was submitted to this court by the parties. Thus, to resolve the takings claim in this case, we must first summarize the *Presbytery* takings framework and then discuss the impact of *Lucas* on that framework before proceeding to resolve the park owners' takings claim.

## A. Takings

### 1. *Presbytery* Analysis.

*Presbytery* sets out two threshold questions to determine if additional takings analysis is necessary. The first question is whether the challenged regulation safeguards the public interest in health, safety, the environment or the fiscal integrity of an area, or whether the regulation "seeks

less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit". *Robinson*, 119 Wn.2d at 49; *Presbytery*, 114 Wn.2d at 329. *See also Sintra*, 119 Wn.2d at 15 ("regulations which enhance public interests, and go beyond preventing harmful activity, may constitute a taking"). The second threshold question is whether the challenged regulation destroys one or more of the fundamental attributes of property ownership — the right to possess, to exclude others, or to dispose of property. *Presbytery*, 114 Wn.2d at 329-30; *Sintra*, 119 Wn.2d at 14 n.6; *Robinson*, 119 Wn.2d at 49-50.

If the regulation merely protects the public health, safety, and welfare (question 1), and the regulation does not destroy a fundamental attribute of ownership (question 2), then no taking occurs, and the court proceeds with determining whether the regulation violates substantive due process if the regulation is challenged on both takings and due process grounds. *Presbytery*, 114 Wn.2d at 330; *Sintra*, 119 Wn.2d at 12-13; *Robinson*, 119 Wn.2d at 50. However, if the regulation either goes beyond preventing a public harm to producing a public benefit, or infringes upon a fundamental attribute of property ownership, further takings analysis is necessary. *Presbytery*, 114 Wn.2d at 330; *Robinson*, 119 Wn.2d at 50.

Once a court determines a regulation is susceptible to a takings challenge, the court next asks whether the regulation substantially advances legitimate state interests. If it does not, the regulation is a taking. *Presbytery*, 114 Wn.2d at 333; *Robinson*, 119 Wn.2d at 50. If the regulation does substantially advance a legitimate state interest, the court's next analysis depends upon whether the challenge to the regulation is a facial challenge or an "as applied" challenge involving the application of the regulation to specific property. *Presbytery*, 114 Wn.2d at 333; *Robinson*, 119 Wn.2d at 50. Under a facial challenge to a statute regulating the uses that can be made of property, the landowner must show that the mere enactment of the statute denies the owner of all economically viable use of his or her land. *Keystone Bitu-*

*minous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494-95, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). In an "as applied" challenge, the court must engage in "ad hoc, factual inquiries" into the particular economic impact of the regulation on specific property under that case's unique circumstances. *Keystone Coal*, 480 U.S. at 495 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979)). Under this analysis, the court considers: (1) the regulation's economic impact on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action. *Presbytery*, 114 Wn.2d at 335-36; *Robinson*, 119 Wn.2d at 51. If the court determines a taking has occurred, then just compensation is mandated. *Presbytery*, 114 Wn.2d at 337; *Robinson*, 119 Wn.2d at 51.

 2. *Lucas v. South Carolina Coastal Council.*

 The United States Supreme Court recently decided *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992), which addressed the issue of whether a land use regulation accomplished an unconstitutional taking of property under the Fifth and Fourteenth Amendments. In *Lucas*, petitioner David Lucas purchased two residential lots on the Isle of Palms in South Carolina, where he intended to build a single-family home on each lot. *Lucas*, 120 L. Ed. 2d at 807. Two years later, South Carolina enacted the Beachfront Management Act, which prohibited the construction of occupiable improvements in certain beachfront areas. *Lucas*, 120 L. Ed. 2d at 808. That act had the direct effect of barring Lucas from erecting any permanent habitable structures on his property. *Lucas*, 120 L. Ed. 2d at 807. Lucas brought suit, alleging the act[2] deprived him of all

---

[2]The opinion in *Lucas* is somewhat unclear about whether Lucas brought a facial or "as applied" challenge to the South Carolina statute. The majority opinion does not explicitly state which type of challenge is at issue, but appears to treat it as a challenge to the face of the statute and applies the rule for a facial takings challenge:

 The cases say, repeatedly and unmistakably, that " '[t]he test to be applied *in considering [a] facial [takings] challenge* is fairly straightforward. A statute

economically viable use of the two parcels of property, thereby effecting a taking without just compensation. *Lucas*, 120 L. Ed. 2d at 808-09.

The trial court agreed with Lucas. The Supreme Court of South Carolina, however, reversed on the grounds that the legislation advanced a legitimate public interest in preventing erosion to coastal zones caused by new construction. *Lucas*, 120 L. Ed. 2d at 809. The court held when a regulation on the use of property is designed to prevent serious public harm, no compensation is owing regardless of the regulation's effect on the property's value. *Lucas*, 120 L. Ed. 2d at 809. The United States Supreme Court granted certiorari and reversed. *Lucas*, 120 L. Ed. 2d at 823.

In analyzing Lucas' takings claim, the Supreme Court identified two discrete categories of regulatory action that are "compensable without case-specific inquiry into the public interest advanced in support of the restraint". *Lucas*, 120 L. Ed. 2d at 812. The first category includes challenges to any regulation that results in a "physical invasion" of the owner's property. *Lucas*, 120 L. Ed. 2d at 812. In this category, a regulation that compels a property owner to suffer a "physical invasion" or "occupation"[3] of his or her property is

---

regulating the uses that can be made of property *effects a taking if it "denies an owner economically viable use of his land."* ' "

(Some italics ours.) *Lucas*, 120 L. Ed. 2d at 813 n.6 (citing *Keystone Coal*, 480 U.S. at 495 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294-96, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981))). However, the trial court analyzed the particular effect of the statute as applied to Lucas's specific property, and the Supreme Court of South Carolina explicitly stated that Lucas brought an "as applied" challenge. *Lucas v. South Carolina Coastal Coun.*, 304 S.C. 376, 377-79, 404 S.E.2d 895, 895-96 (1991), *rev'd*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992). *See also Lucas*, 120 L. Ed. 2d at 829 n.4 (Blackmun, J., dissenting) ("Here, of course, Lucas has brought an as-applied challenge").

[3]A "physical invasion" or "occupation" may be either temporary or permanent, and may result in either a total or partial invasion. According to *Lucas*, categorical treatment is required "*at least* with regard to *permanent* invasions". (Italics ours.) *Lucas*, 120 L. Ed. 2d at 812. Likewise, the Supreme Court has also stated that "temporary" takings are subject to categorical treatment where the regulation denies the owner all use of his or her land. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 96 L. Ed. 2d 250, 107 S.

compensable no matter how weighty the public purpose behind it or how minute the intrusion. *Lucas*, 120 L. Ed. 2d at 812. The second category includes any challenge where a landowner proves a regulation "denies all economically beneficial or productive use of land". *Lucas*, 120 L. Ed. 2d at 813. The Court labeled this category a "total taking". *Lucas*, 120 L. Ed. 2d at 822. If a regulation results in either a "physical invasion" or a "total taking", the owner has suffered a taking and is entitled to just compensation under the Fifth Amendment *regardless* of the public interest advanced in support of the restraint, unless the State can meet a rebuttal test. *Lucas*, 120 L. Ed. 2d at 812-13, 815. Under the rebuttal test, once an owner establishes that a regulation has denied all economically viable use of his or her property, the State can avoid paying compensation only by identifying "background principles of nuisance and property law that prohibit the uses [the owner] now intends in the circumstances in which the property is presently found". *Lucas*, 120 L. Ed. 2d at 823. In other words, the State must show the proscribed use interests were not part of the owner's title to begin with. *Lucas*, 120 L. Ed. 2d at 820.

3. Impact of *Lucas* on the *Presbytery* Takings Analysis.

■■■ The Supreme Court's holding in *Lucas* requires a reordering of the *Presbytery* threshold analysis to accommodate the two *Lucas* categories of takings that do not require case-specific analysis of either the legitimacy of the State's interest or the purpose of the regulation. These categories are "physical invasions" and "total takings".

In squaring *Presbytery* with the *Lucas* analysis, both "physical invasions" and "total takings", as those terms are used in *Lucas*, are most appropriately analyzed under the second prong of the *Presbytery* threshold inquiry, in which the court examines whether a regulation infringes on a fundamental attribute of ownership. *See Presbytery*, 114 Wn.2d at 329-30.

---

Ct. 2378 (1987). The Court observed: "Temporary" takings that deny a landowner all use of his or her property "are not different in kind from permanent takings, for which the Constitution clearly requires compensation". *First English*, 482 U.S. at 318.

Previously, we have indicated "physical invasions" may implicate these fundamental attributes of ownership and thus fall under the second prong of the *Presbytery* threshold test. *Presbytery*, 114 Wn.2d at 330 n.14 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-40, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982) (holding that law requiring landlords to allow television cable companies to place cables in their buildings constitutes a physical taking regardless of how minor the intrusion)). Like "physical invasions", a total denial of all economically beneficial use of property can also be equated with an infringement of a fundamental right of ownership. *Powers v. Skagit Cy.*, 67 Wn. App. 180, 195-96, 835 P.2d 230 (1992) (Grosse, C.J., concurring). In fact, the United States Supreme Court compared "total takings" with "physical invasions" in explaining why "total takings" should be subject to "categorical" treatment. *Lucas*, 120 L. Ed. 2d at 814. The Court stated: The "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation". *Lucas*, 120 L. Ed. 2d at 814. Thus, both categories of "physical invasions" and "total takings" fall under the second prong of the *Presbytery* threshold analysis as infringing on a fundamental right of ownership.

As a result, when a landowner alleges either a "physical taking" or a "total taking", the owner may demonstrate at the outset during the threshold inquiry that the regulation results in a "physical invasion" of his or her property, or deprives the property of all "economically beneficial or productive use". In addition, in light of *Lucas*, the "total takings" category must necessarily include facial challenges to land use regulations in which landowners allege the regulation adversely affects the economic use of their property. *Lucas* dictates this result because in this facial challenge, just as in a "total takings" challenge, the landowner must prove the statute on its face *deprives him or her of all economically viable use of the property. See Keystone Coal*, 480 U.S. at 495. Such a facial challenge to a land use regulation is in effect a "total takings" challenge. Previously, under *Presbytery*, analysis of the economic impact in a facial

challenge was examined *after* the court first performed the threshold test and analyzed the State's interest in the regulation. *See Presbytery*, 114 Wn.2d at 333. However, *Lucas* makes clear that a "total takings" claim, alleging deprivation of all economically viable use, does not require analysis of whether the regulation goes beyond preventing a public harm to conferring a public benefit. *Lucas*, 120 L. Ed. 2d at 819. Likewise, any analysis of the public interest advanced in support of the regulation is irrelevant to a "total takings" claim unless the State can show that the economically viable use denied by the regulation was already barred by existing common law principles of the State's property and nuisance law. *See Lucas*, 120 L. Ed. 2d at 812-13. Therefore, in light of *Lucas*, a plaintiff making a facial challenge to the economic impact of a land use regulation is entitled to categorical treatment if he or she can prove at the outset during the threshold test that the regulation denies all economically beneficial use of the property.

Because the plaintiff must have the opportunity at the outset to prove a "physical invasion" or "total taking", *Lucas* necessitates that we reorder the first two steps of our *Presbytery* threshold test. As noted above, we previously asked under the threshold test whether a regulation implicated fundamental attributes of ownership *after* analyzing the purpose of the statute in preventing harm or conferring a benefit. According to *Lucas*, challenges implicating fundamental attributes of ownership, such as "total takings" or "physical invasions", are subject to categorical treatment and do not require analysis of the purpose of the regulation or the legitimacy of the State's interest. *See Lucas*, 120 L. Ed. 2d at 812-13. Therefore, based on *Lucas*, we must analyze at the outset of the *Presbytery* test whether fundamental attributes of ownership are impaired through "physical invasions" or "total takings", without engaging in any harm-versus-benefit analysis or examining the legitimacy of the governmental interest.

This requirement of *Lucas* can easily be squared with our *Presbytery* analysis by simply reordering the two questions

of our threshold inquiry. Hereafter, the court will begin the threshold inquiry by asking whether the regulation denies the owner a fundamental attribute of ownership. Any analysis of "physical invasions" or "total takings", including all facial challenges to land use regulations, will be analyzed at the outset under the first prong of the threshold test. If the plaintiff proves a "physical invasion" or "total taking" occurred, the plaintiff need not proceed with the remainder of the *Presbytery* analysis. However, if the regulation does not implicate fundamental attributes of ownership, the court will proceed to the next threshold inquiry, analyzing whether the regulation goes beyond preventing a public harm to producing a public benefit. If the purpose of the regulation is to produce a benefit, the court will then proceed with balancing the legitimacy of the State's interest with the adverse economic impact on the landowner.

This reordering of the *Presbytery* threshold test is also in accord with the United States Supreme Court's recent analysis in *Yee v. Escondido*, ___ U.S. ___, 118 L. Ed. 2d 153, 112 S. Ct. 1522 (1992). *Yee* acknowledges that physical takings — and by analogy "total takings" under *Lucas* — are subject to different analysis from other regulatory takings:

> Most of our cases interpreting the [takings] Clause fall within two distinct classes. Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

(Citations omitted.) *Yee*, 118 L. Ed. 2d at 162. Thus, under *Lucas*, our takings analysis of land use regulations is revised to reflect the two categorical takings, "physical invasions" and "total takings", as follows.

Under the *Presbytery* threshold inquiry, as revised above, the court must first ask whether the regulation destroys or derogates any fundamental attribute of property ownership: including the right to possess; to exclude others; or to dispose of property. *See Presbytery*, 114 Wn.2d at 329-30; *Sintra*, 119 Wn.2d at 14 n.6; *Robinson*, 119 Wn.2d at 49-50. In light of *Lucas*, another "fundamental attribute of property" appears to be the right to make *some* economically viable use of the property. *See Lucas*, 120 L. Ed. 2d at 813-15. If the landowner alleges a "physical invasion" or "total taking", a fundamental right of ownership may be implicated. Therefore, under *Lucas*, the landowner must have the opportunity to prove at the outset under the first threshold inquiry that the regulation either physically "invades" his or her property or denies all economically viable use of the property. Because facial challenges to the economic impact of land use regulations require the landowner to prove the regulation denies all economically viable use of the owner's property, such facial challenges necessarily fall under this "total takings" category and are analyzed under the first *Presbytery* threshold inquiry.

Under the first threshold analysis, if the landowner proves the regulation results in a "total taking", the State will then have the opportunity to rebut this claim by identifying common law principles of state nuisance and property law that prohibit the uses the landowner now intends in the circumstances in which the property is presently found.[4] *Lucas*, 120 L. Ed. 2d at 820-23. If the landowner proves a "total taking"

---

[4]This question is one of state law. *Lucas*, 120 L. Ed. 2d at 822. *Lucas* notes that this inquiry

> will ordinarily entail . . . analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities, see, e.g., Restatement (Second) of Torts §§ 826, 827, the social value of the claimant's activities and their suitability to the locality in question, see, e.g., id., §§ 828(a) and (b), 831, and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike, see, e.g., id., §§ 827(e), 828(c), 830.

*Lucas*, 120 L. Ed. 2d at 822. However, courts must look to their own state's existing nuisance and property law in making this determination.

or "physical invasion" has occurred, and if the State fails to rebut that claim, the owner is entitled to categorical treatment under *Lucas*. *Lucas*, 120 L. Ed. 2d at 812-13. In other words, the owner is entitled to just compensation without case-specific inquiry into the legitimacy of the public interest supporting the regulation. However, if the owner alleges a "physical invasion" or "total taking" and fails to prove that either has occurred, then there is no per se constitutional taking requiring just compensation.

If the landowner alleges less than a "physical invasion" or "total taking" and if a fundamental attribute of ownership is not otherwise implicated, the court proceeds to the second of the *Presbytery* threshold questions. Under the second inquiry, we ask whether the challenged regulation safeguards the public interest in health, safety, the environment or the fiscal integrity of an area, or whether the regulation "seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit".[5] *Robinson*, 119 Wn.2d at 49. *See also Sintra*, 119 Wn.2d at 14-15; *Presbytery*, 114 Wn.2d at 329. If the regulation goes beyond preventing real harm to the public which is directly caused by the prohibited use of the property and instead imposes on those regulated the requirement of providing an affirmative public benefit, or if the regulation infringes on a fundamental attribute of ownership,[6] the court proceeds with its taking analy-

---

[5]Several parties and the concurrence argue this part of the *Presbytery* threshold test is undermined by language in *Lucas* questioning harm versus benefit analysis. *See Lucas*, 120 L. Ed. 2d at 819. Curiously, the concurrence uses this language as support for a broad insulation doctrine, concurrence at 620 n.13, whereas respondents argue the same language should be read as a complete rejection of any insulation doctrine. We decline to address their arguments, however, which go beyond what is necessary to decide the narrow issue of a facial takings challenge posed in this case. Moreover, it would be premature to begin dismantling our takings framework, carefully crafted in *Presbytery*, *Sintra*, and *Robinson*, without more definitive guidance on this issue from the United States Supreme Court. Therefore, we decline to further modify our framework at this time and reserve discussion of additional modifications, if any, until we are presented with a case that squarely addresses the issue.

[6]Not every infringement on a fundamental attribute of property ownership necessarily constitutes a "taking". *Presbytery*, 114 Wn.2d at 333 n.21. *See, e.g.,*

sis. Under that analysis, the court first examines whether the regulation substantially advances a legitimate state interest. If it does not, the regulation is a taking. *Presbytery*, 114 Wn.2d at 333; *Robinson*, 119 Wn.2d at 50. If, however, the regulation does substantially advance a legitimate state interest, the court then performs a balancing test. The court asks whether the state interest in the regulation is outweighed by its adverse economic impact to the landowner. In particular, the court considers: (1) the regulation's economic impact on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action. *Presbytery*, 114 Wn.2d at 335-36; *Robinson*, 119 Wn.2d at 51. If the court determines that a taking has occurred, then just compensation is mandated. *Presbytery*, 114 Wn.2d at 336; *Robinson*, 119 Wn.2d at 51.

4. Application of Takings Analysis.

Turning to this case, the Department contends the trial court erred in granting summary judgment because the Mobile Home Relocation Assistance Act does not result in an unconstitutional taking. The park owners contend the trial court's ruling was correct because the Act violates both federal and state constitutional provisions prohibiting the State from taking property unless just compensation is paid. *See* U.S. Const. amend. 5 (as applied to the states through the Fourteenth Amendment); Const. art. 1, § 16 (amend. 9). However, the park owners have not briefed the relevant *Gunwall* factors necessary for determining whether an independent analysis of the state constitution is proper. *See* *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Accordingly, we will analyze only the federal constitution; we will not address the park owners' arguments that the state constitution provides greater protection. *See, e.g., World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 390, 816 P.2d 18 (1991), *cert. denied*, ___ U.S. ___, 118 L. Ed. 2d 391, 112 S. Ct. 1672 (1992).

---

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82-83, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980).

Under our revised *Presbytery* takings analysis, we must first decide whether the regulation destroys any fundamental attribute of ownership, including the right to possess, to exclude others, to dispose of property, or to make some economically viable use of property. *See Lucas*, 120 L. Ed. 2d at 813-15; *Sintra*, 119 Wn.2d at 14 n.6; *Robinson*, 119 Wn.2d at 49-50; *Presbytery*, 114 Wn.2d at 333. In this case, the park owners challenge the Act on its face rather than "as applied" to any particular piece of property. As noted above, facial challenges to land use regulations are analyzed at the outset under this first inquiry of the *Presbytery* threshold analysis.

Under a facial challenge to a land use regulation, the landowner must show that the *mere enactment* of the regulation constitutes a taking. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). The test for a facial challenge is a high one, in part because the landowner has not presented any evidence about the particular impact of the regulation on his or her parcel of land. Thus, to succeed in proving that a statute on its face effects a taking by regulating the uses that can be made of property, the landowner must show that the mere enactment of the statute denies the owner of all economically viable use of the property.[7] *Keystone Coal*, 480 U.S. at 495 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294-96, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981)); *Orion Corp. v. State*, 109 Wn.2d 621, 656, 747 P.2d 1062 (1987) (*Orion II*), *cert. denied*, 486 U.S. 1022 (1988). In facial challenges, landowners need not exhaust administrative remedies. *Presbytery*, 114 Wn.2d at 333. Such exhaustion would be futile if indeed the regulation prevented any economically viable use of the land. *See Orion Corp. v. State*, 103 Wn.2d 441, 457-60, 693 P.2d 1369 (1985)

---

[7]In addition to facial challenges to regulations that restrict the use of property, other types of facial challenges include, for example, those alleging that a regulation deprives an owner of a fundamental attribute of ownership or physically invades his or her land. *See* Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 386-92 (1989).

(*Orion* I). A facial challenge in which the court determines a regulation denies all economically viable use of property "should prove to be a relatively rare occurrence". *Presbytery*, 114 Wn.2d at 335; *see Lucas*, 120 L. Ed. 2d at 814.

In this case, the park owners' complaint can only be read as mounting a facial rather than an "as applied" challenge to the Act. It does not address the Act's impact on any specific piece of property. *See Robinson*, 119 Wn.2d at 50. Moreover, the Department's civil appeal statement and the park owners' answer to the civil appeal statement confirm this case involves only a facial challenge. Despite making a facial challenge, the park owners have made no attempt to show the regulation of their property's use under the Act denies them all economically viable use of their property. As a result, the park owners' facial challenge fails insofar as the Act is challenged as a regulation affecting their economic use of their property.[8]

The park owners also contend the Act constitutes a taking by physical "invasion" or occupation. The park owners argue the Act forces them to keep their parks open, imposing the park tenants upon them as unwelcome, permanent occupants on their land. Governmental regulations resulting in physical invasion or occupation of property or regulations authorizing a third party to occupy the property are "takings" regardless of how minor the occupation or how weighty the public interest involved. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982). Such "physical invasions" may implicate a

---

[8]The park owners also raise a facial challenge by alleging the Act does not substantially advance legitimate state interests no matter how it is applied. A regulation that does not substantially advance a legitimate state interest can effect a taking. *Presbytery*, 114 Wn.2d at 333. Such a facial challenge is ripe for review because the allegation does not depend on the extent to which the landowners are deprived of the economic use of their particular property or the extent to which they are compensated. *Yee*, 118 L. Ed. 2d at 169. However, the park owners' argument is without merit. The State has a legitimate interest in addressing the statewide problem of relocation expenses associated with mobile home park closings. Making funds available to mobile home owners who are forced to relocate substantially advances that interest.

fundamental attribute of property ownership under the first prong of our *Presbytery* analysis. As a result, if a landowner proves a regulation compels the owner to suffer a "physical invasion" or occupation of his or her property, the owner is entitled to categorical treatment under *Lucas* and must receive just compensation without any further inquiry into the public interest justifying the regulation. *Lucas*, 120 L. Ed. 2d at 812.

To prove that the government has effected a physical taking through its regulation, the landowner must show that the regulation "*requires* the landowner to submit to the physical occupation of [his or her] land". *Yee v. Escondido*, ___ U.S. ___, 118 L. Ed. 2d 153, 165, 112 S. Ct. 1522 (1992). For example, the government has compelled a physical invasion of property by flooding a landowner's property or by requiring the landowner to allow the physical installation of a cable on the owner's property. *Yee*, 118 L. Ed. 2d at 165 (citing *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 20 L. Ed. 557 (1872); *Loretto*, 458 U.S. at 440).

In a case similar to this one involving regulation of mobile homes, the United States Supreme Court held a local rent control ordinance did not amount to a physical taking of park owners' property because it did not require the landowner to submit to the physical occupation of his or her land. *Yee*, 118 L. Ed. 2d at 165. In holding the regulation did not result in a physical taking, the Court stated:

> [The park owners] voluntarily rented their land to mobile home owners. At least on the face of the regulatory scheme, neither the City nor the State compels [park owners], once they have rented their property to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with six or twelve months notice. Put bluntly, no government has required any physical invasion of [the park owners'] property. [The park owners'] tenants were invited by [the park owners], not forced upon them by the government.

(Citations omitted.) *Yee*, 118 L. Ed. 2d at 165.

In *Yee*, the park owners could still evict the tenants and change the use of their land. Thus, the Supreme Court held the rent control ordinance in that case was only a regulation

of the park owners' *use* of their property, and did not amount to a per se taking because it did not authorize an unwanted physical occupation of the park owners' land. *Yee*, 118 L. Ed. 2d at 168.

Like *Yee*, the park owners' physical takings argument in this case lacks merit. The Act on its face does not force park owners to allow others to occupy their land. Rather, the park owners have voluntarily rented space to the mobile home owners, and the Act itself does not compel the park owners to continue this relationship. Indeed, the Act still allows the park owners to terminate their tenancies, close their parks, and sell their land. Thus, the park owners have failed to show that the Act on its face requires any "physical invasion" of their property.[9] Likewise, for the same reasons, the Act does not unconstitutionally infringe any other fundamental attribute of property ownership, such as the right to possess, exclude others, or dispose of property.

Accordingly, we hold the trial court erred in ruling the Act results in an unconstitutional taking of property without just compensation.

## B. Substantive Due Process

Even if a regulation is not susceptible to a takings challenge, under our *Presbytery* framework, it is next subject to substantive due process scrutiny for reasonableness. *Presbytery*, 114 Wn.2d at 330. In this case, the Department contends the trial court erred in granting summary judgment on the grounds the Act violated the park owners' due process rights. The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. 14, § 1.

---

[9]The park owners also argue that the transfer of money required under the Act itself constitutes a physical taking. We disagree. A similar argument has been twice rejected by the United States Supreme Court. *See Yee*, 118 L. Ed. 2d at 166 (reduction in rent under mobile home residency law may "be said to transfer wealth from the one . . . regulated to another", but "in itself does not convert regulation into physical invasion"); *United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9, 107 L. Ed. 2d 290, 110 S. Ct. 387 (1989) (fee requirements do not constitute physical takings).

To determine whether a regulation violates due process, the court uses the classic 3-prong due process test. *Presbytery*, 114 Wn.2d at 330. We must determine "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner."[10] *Presbytery*, 114 Wn.2d at 330.

In this case, we must first decide whether the Act is aimed at achieving a legitimate public purpose. The purpose of the Act is to aid mobile home owners with relocation expenses when a mobile home park is closed. The State has a legitimate interest in addressing the statewide problem of relocation expenses associated with mobile home park closings. Making funds available to mobile home owners who are forced to relocate substantially advances that interest.

---

[10]The Department argues no federal precedent supports this court's use of undue oppression as an independent third prong of substantive due process. This 3-prong substantive due process test was first used by the United States Supreme Court in *Lawton v. Steele*, 152 U.S. 133, 137, 38 L. Ed. 385, 14 S. Ct. 499 (1894). Although the Court in *Lawton* divided the test into only two parts, undue oppression was part of the analysis. *Lawton*, 152 U.S. at 137 (the means must be "reasonably necessary for the accomplishment of the purpose, and *not unduly oppressive* upon individuals"). (Italics ours.) The Court has continued to apply this 3-part test since *Lawton* and acknowledged the *Lawton* formulation is still valid in *Goldblatt v. Hempstead*, 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962). *Goldblatt* does caution that the rule must not be applied with strict precision because "débatable questions as to reasonableness are not for the courts but for the legislature . . .". *Goldblatt*, 369 U.S. at 595 (quoting *Sproles v. Binford*, 286 U.S. 374, 388, 76 L. Ed. 1167, 52 S. Ct. 581 (1932)). Despite this deference to the Legislature, however, courts may still employ substantive due process analysis. *See Moore v. East Cleveland, Ohio*, 431 U.S. 494, 502, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977) (affirming use of substantive due process to invalidate unreasonable city ordinance); Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way*, 25 J. Urb. & Contemp. L. 3, 23-26 (1983). The "unduly oppressive" analysis merely provides a structure for determining the overall reasonableness of the means used to achieve the regulation's public purpose. *See* Comment, *Testing the Constitutional Validity of Land Use Regulations: Substantive Due Process as a Superior Alternative to Takings Analysis*, 57 Wash. L. Rev. 715, 718, 740 n.157 (1982). Recently, we invalidated a housing ordinance as violating substantive due process because it was unduly oppressive and therefore unreasonable. *Robinson v. Seattle*, 119 Wn.2d 34, 55, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992). The United States Supreme Court refused to grant certiorari in that case.

Thus the Act passes the test of the first due process question.

Under the second due process question, we must determine whether the means used are reasonably necessary to achieve that purpose. Whether the means employed are reasonably necessary to achieving the Act's purpose is debatable. Certainly, providing mobile home owners with relocation assistance would be a reasonably necessary step in achieving the Act's purpose. The more difficult issue here is whether it is reasonably necessary to require the assistance to be paid by the closing park owner. To assist in determining whether these means used by the Act are reasonably necessary in all regards, we must turn to the third due process question, that of undue oppression.

 We determine if a statute is unduly oppressive by examining a number of nonexclusive factors to weigh the fairness of the burden being placed on the property owner:

> On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

*Presbytery*, 114 Wn.2d at 331 (citing Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way*, 25 J. Urb. & Contemp. L. 3, 33 (1983)).

 We begin by examining the factors on the public's side. The Act represents the Legislature's recognition that the problems caused by the closure of mobile home parks are serious. We too note the seriousness of these problems. Mobile home parks provide a source of low-cost housing for the elderly and those with low incomes. These people often cannot afford relocation costs. Yet by requiring the closing park owner to pay these costs, which can amount to extremely high sums of money, the State is placing the burden of solving housing problems on the shoulders of a few. In *Robinson v. Seattle, supra,*

we recently struck down a city ordinance as unduly oppressive where the ordinance required, among other things, relocation assistance to tenants displaced when landowners demolished low income housing on the owners' property. *Robinson,* 119 Wn.2d at 55. We stated:

> The problems of homelessness and a lack of low income housing in Seattle are in part a function of how all Seattle landowners are using their property. . . . This court has already said of the [housing ordinance] that solving the problem of the decrease in affordable rental housing in the city of Seattle is a *burden to be shouldered commonly and not imposed on individual property owners.*

(Italics ours.) *Robinson,* 119 Wn.2d at 55. *See also Sintra,* 119 Wn.2d at 22. Likewise, in this case, the costs of relocating mobile home owners, like the related and more general problems of maintaining an adequate supply of low income housing, are more properly the burden of society as a whole than of individual property owners. While the closing of a mobile home park is the immediate cause of the need for relocation assistance, it is the general unavailability of low income housing and the low income status of many of the mobile home owners that is the more fundamental reason why the relocation assistance is necessary. An individual park owner who desires to close a park is not significantly more responsible for these general society-wide problems than is the rest of the population. Requiring society as a whole to shoulder the costs of relocation assistance represents a far less oppressive solution to the problem.

We next turn to the factors reflecting the legislation's effect on property owners. The amount of money a park owner must pay under the Act is substantial. In fact, under a worst case scenario, the size of the park owner's obligation is staggering. If the relocation assistance fund lacks sufficient resources to pay its share of the burden, the Act leaves park owners liable for paying the entire amount of the relocation assistance — up to $7,500 for each tenant in the park. For example, if a mobile home park has 100 pads, the park owner could be responsible for paying $750,000 solely because the owner wants to exercise his or her right to close

the business. Even if the fund has sufficient resources to share the burden, the Act still requires park owners to pay large sums of money, the amount of which will vary depending on how much notice the park owner gives to the tenants. Moreover, the Act does not limit the payment of relocation assistance to those who have a low income. Although tenants who do not meet the Act's definition of "low income" are not entitled to payments from the fund, they are entitled to receive the same payments made directly by the park owners to low income tenants. Thus, park owners must directly pay relocation assistance even to those tenants who are not financially burdened.

We also note the Act's provisions are permanent in nature. There is no indication the park owners could have anticipated the Act's requirements when they opened their parks; certainly the Act itself did not give them any grace period in allowing them to decide whether to continue to use their property as a mobile home park before the Act went into effect. Thus, park owners were given no opportunity to alter their present or planned uses without subjecting themselves to the Act's onerous obligations.

In this regard, we deem it important that the increased costs imposed by the Act attach to the activity of leaving a business rather than of entering or conducting the business. The Department has cited a number of different cases in which this court has upheld the constitutionality of legislation requiring businesses to pay money to others, yet each of these cases involved costs incident either to entering or conducting the business. *See, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 49 L. Ed. 2d 752, 96 S. Ct. 2882 (1976) (addressing a statute requiring mine operators to pay compensation for black lung disease); *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 P. 1101 (1911) (analyzing a statute requiring employers to pay workers' compensation). Owners of businesses in these earlier cases had the option of avoiding these costs by closing down and using their property for other purposes. The imposition of costs on closing a business cannot be avoided in this manner.

We conclude the Act is unduly oppressive and violates substantive due process. In light of this holding, we need not address the other challenges to the trial court's summary judgment order raised by the Department.

## C. Severability

■ The remaining issue concerns the Act's severability. The Department argues even if the Act is unconstitutional in part, other portions of the Act are valid and should be severed from the unconstitutional portions. The test for severability is whether

> the invalid provisions are unseverable and it cannot reasonably be believed that the legislature would have passed the one without the other, . . . or, alternatively, whether the elimination of the unconstitutional portion so destroys the act as to render it incapable of accomplishing the legislative purposes.

(Citation omitted.) *State v. Anderson*, 81 Wn.2d 234, 236, 501 P.2d 184 (1972); *see Seattle v. State*, 103 Wn.2d 663, 677, 694 P.2d 641 (1985).

In this case, the Act does contain a severability clause, which states that a decision invalidating any provision of the Act will not affect the remainder of the Act. Laws of 1989, ch. 201, § 17. "A severability clause is often given great weight in determining the Legislature's intent to make different parts of a statute severable." *Seattle*, 103 Wn.2d at 678. Nevertheless, in this case, the remaining provisions of the statute are unseverable under the *Anderson* test because the elimination of the unconstitutional provisions renders the remainder of the Act "incapable of accomplishing the legislative purposes". *Anderson*, 81 Wn.2d at 236. For example, the Department argues that a portion of the money to be used for relocation assistance is not paid by the closing park owner, but instead is paid from the collection of fees on the transfer of mobile homes. *See* Laws of 1990, ch. 171, §§ 5(1), 6(1). According to the Department, the transfer fees are valid and may be severed from the unconstitutional portions of the Act. In the 1991 amendments to the Act, however, the Legislature placed a termination date of July 1, 1992, on the collection of these fees. Laws of 1991, ch. 327, § 13(3); *see*

former RCW 59.21.060. Thus, these transfer fees alone cannot provide a sufficient fund to accomplish the legislative purpose of providing payments to assist mobile home tenants with relocating to suitable alternative sites.

Accordingly, we conclude the Department's severability argument is without merit.

## IV
### CONCLUSION

We hold the trial court erred in ruling the Act results in an unconstitutional taking of property without just compensation. However, the trial court correctly concluded the Act violates the park owners' Fourteenth Amendment substantive due process rights. Thus, we hold the Mobile Home Relocation Assistance Act, codified at RCW 59.21, enacted by Laws of 1989, ch. 201, and as amended by Laws of 1990, ch. 171, is unconstitutional. We affirm the trial court's order granting summary judgment, enjoining enforcement of the Act, and awarding the plaintiffs judgment against the defendant for their costs herein.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

UTTER, J. (concurring) — While I concur in the majority's conclusion that the Mobile Home Relocation Assistance Act (Act) is unconstitutional as a violation of substantive due process, I write separately to highlight what I view as a troubling development in our takings law. In dicta, the majority has apparently accepted the notion that our recent decisions in *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765, *cert. denied sub nom. Robinson v. Seattle*, ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992) and *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318, *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992), effected a significant transformation of the takings analysis which we so carefully and painstakingly constructed in *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486

U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990). I disagree both with the majority's nonbinding new formulation and with the theory that *Sintra* and *Robinson* worked such a change in our takings law.

## I

The language in the majority which I find objectionable is dicta and as such is not binding on this court in subsequent cases. The plaintiffs have brought only a facial takings challenge against the Act, and the majority has correctly determined that no showing has been made of a complete deprivation of all economically viable use. Under the majority's analysis, this determination disposes of the plaintiffs' takings claims entirely. Consequently, those portions of the majority which otherwise describe our takings analysis are not necessary to the disposition of the case and are thus dicta. Even with this caveat in mind, however, I am still unable to join the majority opinion. For the sake of discussion in future cases an expression of my views may be helpful.

In *Orion* and *Presbytery*, this court developed a comprehensive framework for analyzing constitutional challenges to land use regulations. One of the critical features of that framework was the distinction it drew between challenges dealt with under the due process clause and challenges heard under the takings clause. The distinction was necessary because of conflict between two divergent lines of federal authority, one derived from *Mugler v. Kansas*, 123 U.S. 623, 31 L. Ed. 205, 8 S. Ct. 273 (1887), and the other from *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158 (1922).

In *Mugler*, the United States Supreme Court emphatically rejected the notion that the State must compensate landowners for police power regulations which happen to affect the value of private land.

A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the

health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.

123 U.S. at 668-69. In *Pennsylvania Coal*, without discussing *Mugler*, the United States Supreme Court apparently reversed field, stating cryptically that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415. The tension between *Mugler* and *Pennsylvania Coal* was evident, and has been identified as the source of decades of confusion in takings law.[11] To date, the United States Supreme Court has not provided any definitive resolution of the conflict, having overruled neither *Mugler* nor *Pennsylvania Coal. Compare Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987) (applying a *Mugler*-type analysis) *with Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992) (determining when a land use regulation went "too far").

In *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990), we developed a careful resolution of the *Mugler-Pennsylvania Coal* problem by recognizing a critical difference between due process and takings challenges to land use regulations. We held in *Orion* that generally when a landowner challenges a land use regulation safeguarding "the *public* interest in health, the environment, or the fiscal integrity of the community", that is, a valid police power regulation, the landowner is limited to the due process remedy of invalidation of the offending regulation. *Orion*, 109 Wn.2d at 657. The chief exception to this rule was the cir-

[11]*See, e.g.*, Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 345-51 (1989); Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way*, 25 J. Urb. & Contemp. L. 3, 11-14 (1983). *See also* Rose, Mahon *Reconstructed: Why the Takings Issue is Still a Muddle*, 57 S. Cal. L. Rev. 561, 587-97 (1983-1984) (describing fundamental tension between civic duty conceptions of property and those based on individual liberty).

cumstance where the land use regulation served the purpose of "enhanc[ing] a publicly owned right in land." *Orion*, 109 Wn.2d at 651. In other words, land use regulations based on the police power were to be analyzed under due process rather than as takings, unless the State was in fact employing the guise of police power regulation to appropriate land for public use.

In *Presbytery*, we limited the *Orion* holding by recognizing that a land use regulation based on the police power could be subject to takings challenges *if* the regulation in question "destroys one or more of the fundamental attributes of ownership — the right to possess, to exclude others and to dispose of property." *Presbytery*, 114 Wn.2d at 329-30. Together *Orion* and *Presbytery* thus described a simple rule for challenges to police power land use regulations: Such challenges were to be analyzed under the due process clause, *unless* the regulations were employed to enhance the value of publicly held property, or destroyed a fundamental attribute of property.

By clearly delineating the circumstances under which takings challenges would be permitted, the *Orion-Presbytery* test defused the basic tension between *Mugler* and *Pennsylvania Coal*.[12] It also effectively balanced the competing rights of state agencies and property owners. On the one hand, governmental agencies were no longer required to run the risk of huge liabilities whenever they enacted innovative land use regulations.

> [I]f local governments in the past had thought that enactment of a land use regulation might result in monetary awards, then "very likely no one would have proposed the planned unit development, the cluster zone, or the floating zone and even if those efforts had received the prior blessing of developers, it is highly unlikely that environmental con-

---

[12]The chief analytic hurdle faced by the *Orion* court in originally elucidating its resolution of the *Mugler-Pennsylvania Coal* tension was the fact that Justice Holmes had employed the term "taking" in describing the effect of a land use regulation that went "too far". 260 U.S. at 415. To overcome this hurdle, the *Orion* court recognized, as had previous courts, that the *Pennsylvania Coal* "too far" test was in fact a metaphor for due process analysis. *Orion*, 109 Wn.2d at 651 (citing *Fred F. French Investing Co. v. New York*, 39 N.Y.2d 587, 350 N.E.2d 381, 385 N.Y.S.2d 5 (1976)).

cerns or regulation of coastal and inland waterways would ever have been risked."

*Presbytery*, 114 Wn.2d at 332 (quoting Sallet, *Regulatory "Takings" and Just Compensation: The Supreme Court's Search for a Solution Continues*, 18 Urb. Law. 635, 636 (1986) (quoting Wright, *Exclusionary Land Use Controls and the Taking Issue*, 8 Hastings Const. L.Q. 545, 583 (1980-1981))). On the other, landowners were protected from land use regulations that go "too far" by the guaranty of due process. As the majority amply demonstrates today, that guaranty is hardly toothless.

The *Orion* and *Presbytery* approach to police power land use regulations has come to be known, somewhat inaptly, as the "insulation doctrine". It is so called because most ordinary land use regulations are "insulated" from takings challenges. The appellation is inapposite, however, because such regulations are *not* insulated from due process examination.

The majority, in dicta, has departed from this portion of the comprehensive structure erected in *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990). It states that a police power regulation will be subject to a takings challenge if it " 'seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit.' " Majority, at 594-95 (quoting *Robinson v. Seattle*, 119 Wn.2d 34, 49, 830 P.2d 318, *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992)).

The differences between this formulation and the one originally set out in *Orion-Presbytery* are substantial. Under the *Orion-Presbytery* test, a police power regulation is only subject to takings analysis when it enhances the value of *publicly held property*. Under the majority's version, such a regulation is subject to takings analysis when it requires the provision of a public benefit, even if the only properties benefited are privately held. The number of police power

regulations which actually enhance the value of publicly held land is relatively small. The number of police power regulations which arguably require the provision of a public benefit is potentially enormous. Jettisoning the original form of the *Orion-Presbytery* test dramatically expands the potential number of takings challenges.

## II

The majority's reformulation of the *Orion-Presbytery* test is troubling for a number of reasons. First, it requires courts to engage in a form of analysis which is logically incoherent and which has been explicitly, and recently, disavowed by the United States Supreme Court. Second, the majority's formulation has the capacity to resurrect all of the difficulties which initially spurred this court to develop the *Orion-Presbytery* test in the first place. And third, the cases on which the majority relies were, like this one, cases in which the appropriate formulation of the insulation doctrine was not directly relevant to the decision.

As noted above, the majority exposes a land use regulation to takings challenge when the regulation " 'seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit.' " Majority, at 594-95 (quoting *Robinson*, 119 Wn.2d at 49). Effectively, this analysis requires courts to determine whether a given regulation is "harm-preventing", or "benefit-producing".

There is no principled manner in which to make this determination. Does a regulation which prohibits the building of a smoke-belching factory, for example, "prevent the harm of pollution" or "provide the benefit of clean air"? Does a regulation which requires coal companies to leave portions of their coal in the earth to support the surface "prevent the harm of subsidence" or "provide the benefit of stable land"? There simply are not principled answers to these questions. Indeed, since it is possible to argue that virtually any land use regulation provides *some* public benefit, the result of the majority's formulation may be to obliterate the insulation doctrine altogether.

The logical incoherence of the harm/benefit distinction was recently recognized by the United States Supreme Court in *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992).[13] The Court treated the harm/benefit analysis harshly, noting "the distinction between 'harm-preventing' and 'benefit-conferring' regulation is often in the eye of the beholder." 112 S. Ct. at 2897. Under the facts of *Lucas*, the Court observed:

> One could say that imposing a servitude on Lucas's land is necessary in order to prevent his use of it from "harming" South Carolina's ecological resources; or, instead, in order to achieve the "benefits" of an ecological preserve.

112 S. Ct. at 2898.

The *Orion-Presbytery* analysis, by way of sharp contrast, does not rely upon the insupportable distinction between harm-preventing and benefit-producing regulations. Instead, it asks only whether the challenged regulation "enhance[s] a publicly owned right in land." *Orion*, 109 Wn.2d at 651. A court must inquire whether the regulation in question actually puts the privately held land *to public use*, rather than whether it produces benefit which might accrue to public lands as well as private. In other words, does the regulation effectively impose a servitude on the private land in favor of publicly held land?[14]

---

[13]I recognize that the majority has reserved the question of the impact of *Lucas* on the insulation doctrine, at least partially in order to avoid "dismantling our takings framework, carefully crafted in *Presbytery, Sintra,* and *Robinson*". Majority, at 603 n.5. This aspect of *Lucas*, however, does not require us to dismantle our takings framework; instead, it indicates that certain *mutations* of that framework were unwise and therefore supports a return to the original *Orion-Presbytery* test.

[14]Some commentators have misunderstood this aspect of the *Orion-Presbytery* framework. *See, e.g.,* Comment, *Taking Issue With Takings: Has the Washington State Supreme Court Gone Too Far?*, 66 Wash. L. Rev. 545, 556 (1991). Indeed, a footnote in *Presbytery* itself appears to conclude that the test requires a harm/benefit analysis. *Presbytery*, 114 Wn.2d at 329 n.13. This is not a necessary result, however. Commentators have repeatedly recognized that a public use understanding of the takings clause does not necessarily devolve into the "morass" of harm/benefit analysis. *See, e.g.,* Rubenfeld, *Usings*, 102 Yale L.J. 1077, 1111-30 (1993); Stoebuck, *Police Power, Takings, and Due Process*, 37 Wash. & Lee L. Rev. 1057, 1083-89 (1980). Properly put, the question is not whether a given regulation

Of course, private property can be taken for public use even when there is no overt occupation or appropriation. Thus, this court entertained the possibility that the creation of the Padilla Bay Sanctuary worked a taking on Orion's tideland holdings because any reasonably profitable use of those tidelands may have been preempted by the Sanctuary itself. *Orion Corp. v. State*, 109 Wn.2d 621, 662, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988). If the Sanctuary did in fact prohibit such use, it had effectively appropriated Orion's land on behalf of the Sanctuary and was thus a taking.[15] Similarly, in *United States v. Causby*, 328 U.S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062 (1946), the United States Supreme Court found a taking where a farmer lost his livestock business as a result of aircraft flying low over his land to touch down at a nearby airport. The Court found a taking because the aircraft essentially imposed a servitude on the private land in favor of the public airport. "[T]he land is appropriated as directly and completely as if it were used for the runways themselves." 328 U.S. at 262.

The majority's formulation in dicta of the insulation doctrine is also troubling in that it resurrects some of the problems which *Orion-Presbytery* labored so mightily to avoid. As noted above, one of the principal motivating concerns of *Orion-Presbytery* was the possibility that uncertainty in takings law could stifle needed development in land use regulation through the specter of huge liability judgments against local government. *See Orion*, 109 Wn.2d at 649; *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 332, 787 P.2d 907, *cert.*

---

provides a benefit for public lands, which would indeed re-create the harm/benefit problem, but rather whether the regulation provides for public *use* of the private property. This is why shutting down a smoke-emitting factory (which may benefit all nearby land, including public land) is not a taking, *Hadacheck v. Sebastian*, 239 U.S. 394, 60 L. Ed. 348, 36 S. Ct. 143 (1915), but creating a navigable servitude into a private pond for public use is, *Kaiser Aetna v. United States*, 444 U.S. 164, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979).

[15]The court remanded to determine whether any such reasonably profitable use existed. *Orion*, 109 Wn.2d at 662.

*denied,* 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990). By stating a test as amorphous and manipulable as the harm/benefit distinction, the majority re-creates that uncertainty. Since there is no principled fashion in which a court can determine whether a given regulation is harm preventing or benefit producing, there is of course no way for regulators to be able to predict judicial response. Under the majority's formulation, takings law is returning to where it was prior to *Orion* and *Presbytery.*

In revising the *Orion-Presbytery* test, the majority chiefly relies upon this court's recent decisions in *Sintra, Inc. v. Seattle,* 119 Wn.2d 1, 829 P.2d 765, *cert. denied sub nom. Robinson v. Seattle,* ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992) and *Robinson v. Seattle,* 119 Wn.2d 34, 830 P.2d 318, *cert. denied,* ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992). While it is true that the court in both of those cases described the *Orion-Presbytery* test in the same manner as does the majority here, in neither case was the shift in language necessary to the decision reached. Furthermore, neither decision discussed the possibility that it was working a fundamental change in the *Orion-Presbytery* test and thus the court did not have an opportunity to discuss the merits or demerits of a revision in the takings law.

In *Sintra* and *Robinson,* the plaintiff landowners brought a 42 U.S.C. § 1983 action against the City of Seattle,[16] citing violations of due process and of the takings clause. As a threshold matter, the City defended against the takings claim on *Orion-Presbytery* insulation doctrine grounds. It argued that the regulation in question, the Housing Preservation Ordinance (HPO), was a valid police power measure enacted to address the serious problem of displacement and homelessness of low-income tenants. *Sintra,* 119 Wn.2d at

---

[16]42 U.S.C. § 1983 provides what amounts to a tort remedy for violations of federal civil rights. In order to prevail on such a claim, a plaintiff must show: (1) a deprivation of a federal constitutional or statutory right; (2) that the deprivation was caused by someone acting "under color of state law". *Parratt v. Taylor,* 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981); *see also Sintra, Inc. v. Seattle,* 119 Wn.2d 1, 12, 829 P.2d 765, *cert. denied sub nom. Robinson v. Seattle,* ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992).

14 (citing Brief of Respondent, at 37). As such, the City believed the HPO was protected from a takings challenge by the insulation doctrine.

In reviewing this claim, the *Sintra* court transformed the *Orion-Presbytery* analysis. While it initially cited *Presbytery* for the proposition that regulations are only subject to takings challenges when they "actually enhance [] a publicly owned right in property", *Sintra*, 119 Wn.2d at 14 (quoting *Presbytery*, 114 Wn.2d at 329-30), it later replaced the *Orion-Presbytery* rule with the notion that regulations may be subject to takings challenges when they "enhance *public interests*." (Italics mine.) *Sintra*, 119 Wn.2d at 15. As described above, the difference between "enhancing a publicly owned right in property" and "enhancing a public interest" is tremendous, yet the *Sintra* court gave no indication that any change, much less a significant one, had occurred.

The *Sintra* court then expressed its opinion that, under its new test, the HPO was a benefit-producing measure rather than a harm-preventing measure. *Sintra*, 119 Wn.2d at 15-16.[17] The court, however, did not rest upon this determination. Instead, it noted that since the HPO had already been held to be an invalid tax in *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 735 P.2d 673 (1987), the HPO was not a valid police power regulation *at all*. It stated:

> Certainly, a regulatory scheme which is later determined to be a tax surpasses the proper scope of the City's police power. We, therefore, can determine, as a matter of law, that the HPO was not a proper exercise of the City's police power, and *Presbytery*'s threshold requirements have been met here.

(Footnote omitted.) 119 Wn.2d at 16. Thus, since the court determined that the HPO's inherent invalidity met the requirements of the insulation doctrine, it was unnecessary

---

[17]This aspect of the *Sintra* opinion provides an excellent example of the manipulability of the harm/benefit distinction. There, the court stated that the HPO was "benefit producing" because the "harm sought to be prevented — people standing on the street corner with nowhere to go — was exceeded." *Sintra*, 119 Wn.2d at 15-16. It is difficult to see why building new housing does not serve to prevent the harm of "people standing on the street corner".

for the court to decide whether to apply the original version of the doctrine or its new version.[18]

The court's decision in *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318, *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992) was similar. There, a class of landowners sought civil rights damages under 42 U.S.C. § 1983 against the City of Seattle for the City's enforcement of the same HPO at issue in *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765, *cert. denied sub nom. Robinson v. Seattle*, ___ U.S. ___, 121 L. Ed. 2d 598, 113 S. Ct. 676 (1992). As in *Sintra*, the gravamen of the civil rights claims were takings without just compensation and violations of substantive due process. 119 Wn.2d at 48.

In *Robinson*, the court did not even state the *Orion-Presbytery* test in its original form, nor, like the *Sintra* court, did it indicate that a change had taken place. Instead, it simply asserted that regulations which "go[] beyond mere harm prevention to require a property owner to provide a public benefit". 119 Wn.2d at 50. The *Robinson* court, like the *Sintra* court, then expressed the opinion that the HPO surmounted the insulation doctrine because it "required property owners to provide a public benefit". 119 Wn.2d at 52.

Despite these initial observations, the *Robinson* court did not conclude that there had been a taking. Instead, the court held that the Robinsons had failed to make a sufficient facial takings challenge to the HPO, in that they had not shown that the regulation had "denied all economically viable use of any regulated property." (Italics omitted.) *Robinson*, 119 Wn.2d at 53-54. Since the Robinsons had only made a facial takings challenge to the HPO, and had failed to adequately support that challenge, their claim failed regardless of whether the *Orion-Presbytery* insulation doctrine or the new version was employed. As was the case with *Sintra*, the adoption of the

---

[18]The court's decision in *Sintra* is admittedly unclear on this point. The *Sintra* court apparently believed that the invalidity of the HPO as a tax was synonymous with its character as a benefit-producing police power regulation. *Sintra*, 119 Wn.2d at 15-16. Since benefit-producing police power regulations are not *per se* invalid, the most sensible reading of the *Sintra* decision is that it surmounted the *Presbytery* threshold simply by noting that the HPO was an invalid exercise of the police power.

new version of the insulation doctrine was not necessary to the decision.[19]

Our decisions in *Sintra* and *Robinson*, like our decision in this case, thus do not represent binding statements of the appropriate scope of the insulation doctrine.

## III

The majority's unnecessary and nonbinding reformulation of the *Orion-Presbytery* insulation doctrine represents an alarming trend in our takings law. While the majority's statements are only dicta, this trend should not be allowed to continue and perhaps crystallize into settled law without comment. Since I believe the changes endorsed by the majority are unwise and unsupported by our case law, I concur only in the opinion of the court that the Act violates substantive due process and the judgment of the court that the Act has not worked a taking.

Reconsideration denied September 10, 1993.

---

[19]It might be argued that the elaborate analyses of takings challenges which we have established in our cases actually require a linear analytic progression, rather than the more limited approach suggested by my discussion. Under that view, in order to reach the question of the facial challenge in *Robinson*, it was *necessary* for the court to first dispose of the insulation doctrine. It is, however, commonplace for courts to ignore extraneous issues in order to decide cases on dispositive issues, even when the extraneous issues may be analytically prior to the dispositive ones. In determining the holding of a particular case, therefore, we need look only to those dispositive issues.