[No. 50815-6-I. Division One. June 23, 2003.]

EDMONDS SHOPPING CENTER ASSOCIATES, ET AL., *Appellants*, v. THE CITY OF EDMONDS, *Respondent*.

347

*Robert M. Tull* (of *Langabeer, Tull & Lee, P.S.*) and *Heather A. Wolf* (of *Brownlie & Evans, L.L.P.*), for appellants.

*J. Zachary Lell* and *W. Scott Snyder* (of *Ogden Murphy Wallace, P.L.L.C.*), for respondent.

Cox, A.C.J. — Edmonds Shopping Center Associates, MBPH, Inc. d/b/a Marty's Public House, and Albert Dykes and Margaret Ryan-Dykes (collectively Dykes) appeal the trial court's grant of summary judgment substantially in favor of the city of Edmonds concerning its adoption of Ordinance 3328. The ordinance prohibits cardrooms and addresses other issues that we describe later in this opinion.

We hold that section 1 of the ordinance is a proper exercise of the police power of the city. Moreover, state law preempts the field of the other activities that the ordinance purports to affect. The city's exercise of its police power divested Dykes of the claimed vested right to operate a cardroom. The ordinance does not operate to take property in the constitutional sense, and there were no violations of substantive or procedural due process rights. Accordingly, we affirm the trial court's decision as to section 1 of the

ordinance, but reverse the decision to the extent that it validates portions of section 2.

Albert Dykes and Margaret Ryan-Dykes own and operate Marty's Public House (Marty's). Marty's is a restaurant, bar, and cardroom facility located in Edmonds. Marty's has an E-5 gambling permit from the Washington Gambling Commission. This authorizes social card games as "commercial stimulants" to the selling of food and drink for consumption on the premises, as provided by law.[1]

In September 1998, Dykes applied to the commission for an E-15 gambling permit to expand the cardroom to 15 tables. In order to obtain this license, Dykes needed to renovate Marty's. Dykes applied to the city for a building permit in February 2000. The city granted the permit in March 2000.

In September 2000, citizens presented an initiative petition to the Edmonds City Council that called for a ban on cardrooms and further provided for a phaseout of existing cardrooms. The city council adopted the initiative without modification, enacting Ordinance 3328.

Dykes sued the city, seeking a declaratory judgment against the ordinance. Following cross motions for summary judgment, the trial court substantially granted the city's motion. But the court also ruled that certain portions of the ordinance were invalid.

Dykes appeals and the city cross-appeals.

We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] We review questions of law de novo.[3]

Here, both sides expressly concede there are no genuine issues of material fact. We agree. Thus, our focus is on the

---

[1] RCW 9.46.070(2).

[2] CR 56(c).

[3] *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

legal question of whether the city was entitled to a judgment as a matter of law.

## ARTICLE XI, SECTION 11

Dykes argues that Ordinance 3328 conflicts with article XI, section 11 of the state constitution because it is not a reasonable exercise of the city's police power. Because case and statutory authority is to the contrary, we reject this unpersuasive argument.

Section 1 of the Ordinance states:

> Chapter 3.24 Taxation and Regulation of Gambling is hereby amended by the enactment of a new Section 3.24.015 Cardrooms Prohibited to read as follows:
>
> 3.24.015 Cardrooms Prohibited.
>
> The conduct or operation of social card games as commercial stimulants as defined in RCW 9.46.0217 and 9.46.0282 shall be prohibited.

■■ "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws."[4] An ordinance is inconsistent with article XI, section 11 if (1) the ordinance conflicts with some general law; (2) the ordinance is not a reasonable exercise of the city's police power; or (3) the subject matter of the ordinance is not local.[5] "Whether an ordinance is reasonable, local, or conflicts with a general law for purposes of article XI, section 11 is purely a question of law subject to de novo review."[6] The second of the three above criteria is at issue here.

### Reasonable Exercise of Police Power

Dykes argues that Ordinance 3328 is not a legitimate exercise of the city's police power because the city has failed

---

[4] WASH. CONST. art. XI, § 11.

[5] *Weden v. San Juan County*, 135 Wn.2d 678, 692, 958 P.2d 273 (1998).

[6] *Weden*, 135 Wn.2d at 693.

to demonstrate that the ordinance was enacted to protect the health, safety, or general welfare of the public. Specifically, he contends there is no evidence in the record that licensed cardrooms negatively affect the community and there is no public policy to reduce or eliminate lawful gambling. We hold that the ordinance is a reasonable exercise of the city's police power.

A two-part test applies to determine whether a law is a reasonable exercise of the police power. First, the regulation "must promote the health, safety, peace, education, or welfare of the people."[7] Second, the requirements of the regulation "must bear some reasonable relationship to accomplishing the purpose underlying the statute."[8] An ordinance may be struck down as beyond the police power only if it is shown that it is " 'clearly unreasonable, arbitrary or capricious.' "[9]

The first question is whether the ordinance promotes the health, safety, peace, education or welfare of the people. We resolve that question by comparing the ordinance in question with the provisions of article XI, section 11.[10]

Case law and statutes make clear that the regulation of gambling is a valid exercise of a municipality's police power.[11] Municipal police power is as extensive as that of the state.[12] And there can be no doubt that the regulation of gambling, whether licensed or not, is within the police power specified in article XI, section 11. Furthermore, RCW 9.46.010 sets forth a legislative declaration of policy re-

---

[7] *Weden*, 135 Wn.2d at 700.

[8] *Weden*, 135 Wn.2d at 700.

[9] *Weden*, 135 Wn.2d at 700 (quoting *Homes Unlimited, Inc. v. City of Seattle*, 90 Wn.2d 154, 159, 579 P.2d 1331 (1978)).

[10] *See Weden*, 135 Wn.2d at 700-01 (comparing the challenged ordinance with article XI, section 11 to determine whether the first prong of the test was satisfied).

[11] *Weden*, 135 Wn.2d at 691 (quoting *Lawton v. Steele*, 152 U.S. 133, 14 S. Ct. 499, 38 L. Ed. 385 (1894)).

[12] *Weden*, 135 Wn.2d at 692 (quoting *Covell v. City of Seattle*, 127 Wn.2d 874, 878, 905 P.2d 324 (1995)).

specting gambling. Among other things, it states the policy of this state is to limit the nature and scope of gambling activities and further states a policy of strictly regulating and controlling such activities.

■ Dykes cites no authority for the novel proposition that evidence in the record is required for a municipality to affect, within constitutional and statutory limitations, the business of gambling. Because he has cited no authority, we must presume he has found none.[13]

Because Dykes cannot and does not argue that his activity is exempted from regulation, and the case and statutory authority does not support his claim, he fails to demonstrate that he is entitled to relief under the first prong of the analysis.

■■ We move to the second prong. Once we determine that an ordinance serves a legitimate public purpose, we must next examine whether the ordinance uses " 'means that are reasonably necessary to achieve that purpose.' "[14]

While it is unclear whether and to what extent Dykes focuses his argument on the second prong of the governing test, we will assume that he claims that the record must evidence some sort of showing to support the city's actions. Thus, he focuses on evidence in the record that a police chief's survey of the Puget Sound region indicated that there was little peripheral crime associated with cardrooms. However, that report is not dispositive.

" '[T]he State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures

---

[13] *State v. Young*, 89 Wn.2d 613, 625, 574 P.2d 1171, *cert. denied*, 439 U.S. 870 (1978) (courts may assume that where no authority is cited, counsel has found none after search).

[14] *Weden*, 135 Wn.2d at 701 (quoting *Rivett v. City of Tacoma*, 123 Wn.2d 573, 581, 870 P.2d 299 (1994)).

are necessary for the protection of such interests.' "[15] " 'In determining whether ... particular legislation tends to promote the welfare of the people of the State of Washington, [the court] must presume that if a conceivable set of facts exists to justify the legislation, then those facts do exist and the legislation was passed with reference to those facts.' "[16]

Here, the record makes clear that while the city's decision may have been debatable, it used reasonable means to effectuate that decision. First, the ordinance was passed pursuant to a state statute that specifically authorized the municipality to exercise a local option to ban cardrooms. Dykes does not argue that the statute is invalid. Thus, it is difficult to see why the city's exercise of the express authority granted to it by statute does not satisfy the second prong of the test we apply in this case. Second, the record shows that prior to its decision, the city formed a task force to study the question of whether cardrooms should be allowed in Edmonds. The task force considered three aspects of cardroom gambling: law enforcement concerns, taxes and revenue, and the effects on neighborhoods. That task force considered various studies on these subjects and surveyed members of the community. Some council members expressed their strong beliefs that gambling negatively affected the local community and one concluded that the city should not use gambling to generate revenue. The council member noted that the city did not want to rely on revenue from gambling, potentially 5 to 10 percent of the city's revenue, because that might give one or two businesses substantial control over the city's revenue base. Simply because there is no clear consensus on the benefits or harms associated with an activity does not make a move

---

[15] *Weden*, 135 Wn.2d at 691 (emphasis omitted) (quoting *Lawton*, 152 U.S. at 136).

[16] *See Weden*, 135 Wn.2d at 705 (quoting *State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 504, 816 P.2d 725 (1991)).

to ban that activity inherently unreasonable.[17] As the cases hold, a determination on this issue "is best left to a legislative body."[18] Dykes fails to demonstrate entitlement to relief under the second prong of the test.

The city's exercise of its police power to regulate gambling was reasonable.

### Preemption

Dykes also argues that sections 1 and 2 of Ordinance 3328 are preempted by state law. He argues that section 1 is preempted because it revokes a license that only the Gambling Commission can revoke, in violation of RCW 9.46.295. He argues that section 2 alters the scope of his gambling license, also in conflict with RCW 9.46.295. The city agrees that state law preempts the phasing out schedule in section 2. We hold that state law preempts section 2, but not section 1 of the ordinance.

A person challenging a statute bears the burden of proving beyond a reasonable doubt that it is unconstitutional.[19] Preemption occurs when the legislature states its intention either expressly or by necessary implication to preempt the regulated field.[20] The test for determining whether an ordinance is in conflict with a general law is whether the ordinance permits that which the statute forbids, or forbids that which the statute permits.[21]

RCW 9.46.285 expressly preempts any licensing and regulatory functions of gambling by any entity other than

---

[17] See Weden, 135 Wn.2d at 704-05; See also Jim Springer, Norm Maleng & Mike Lowry, Pro/Con: Should Washington Take The Big Gamble?, THE SEATTLE TIMES, Apr. 6, 2003, at C1 (the public policy questions associated with gambling in Washington, including the effect on state and local revenues, and who benefits from gambling income, are debated).

[18] Weden, 135 Wn.2d at 703.

[19] State v. Labor Ready, Inc., 103 Wn. App. 775, 779, 14 P.3d 828 (2000) (citing City of Seattle v. Montana, 129 Wn.2d 583, 589, 919 P.2d 1218 (1996)).

[20] Kennedy v. City of Seattle, 94 Wn.2d 376, 383, 617 P.2d 713 (1980).

[21] Weden, 135 Wn.2d at 693 (quoting Vill. of Struthers v. Sokol, 108 Ohio St. 263, 140 N.E. 519 (1923)).

the state, "except as to the powers and duties of any city, town, city-county, or county which are specifically set forth in this chapter."

RCW 9.46.295 states:

Any license to engage in any of the gambling activities authorized by this chapter as now exists or as hereafter amended, and issued under the authority thereof shall be legal authority to engage in the gambling activities for which issued throughout the incorporated and unincorporated area of any county, *except that a city located therein with respect to that city, or a county with respect to all areas within that county except for such cities, may absolutely prohibit, but may not change the scope of license, any or all of the gambling activities for which the license was issued.*[22]

We construe statutes as a whole to give effect to all the language and to harmonize all provisions.[23] The construction of a statute is a question of law that we review de novo.[24] In considering a statute, we must " 'assume that the legislature means exactly what it says,' "[25] and we will "give words in a statute their plain and ordinary meaning."[26] We will construe statutes to avoid strained or absurd results.[27]

Dykes's argument that the ordinance revokes a license that only the Gambling Commission can revoke is unpersuasive. Section 1 of Ordinance 3328 states, "[t]he conduct or operation of social card games as commercial stimulants as defined in RCW 9.46.0217 and 9.46.0282 shall be prohibited." RCW 9.46.295 clearly allows the city to "absolutely prohibit . . . gambling activities for which the

---

[22] (Emphasis added.)

[23] *City of Seattle v. Fontanilla*, 128 Wn.2d 492, 498, 909 P.2d 1294 (1996).

[24] *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996).

[25] *Morgan v. Johnson*, 137 Wn.2d 887, 891-92, 976 P.2d 619 (1999) (quoting *State v. McCraw*, 127 Wn.2d 281, 288, 898 P.2d 838 (1995)).

[26] *State v. Keller*, 98 Wn. App. 381, 383-84, 990 P.2d 423 (1999), *cert. denied*, 534 U.S. 1130 (2002).

[27] *State v. Akin*, 77 Wn. App. 575, 580, 892 P.2d 774 (1995).

license *was issued*."[28] There is no room to argue that a city can prohibit only future gambling activities; the use of the language "was issued" controls. The interpretation offered by Dykes would lead to the illogical result that a city could prohibit only future gambling activities, but would have to allow existing activities.

Dykes also argues that section 1 applies only to future cardrooms and that this is an invalid regulation, as opposed to an outright prohibition, on gambling activities. Dykes's reasoning is that, because section 2 applies only to existing cardrooms, section 1 must apply only to future cardrooms.

First, the plain language of section 1 gives no indication that it is limited to future cardrooms. Second, as will be discussed below, state law preempts section 2. Thus, there is no conflict between section 2 and section 1 that would force the conclusion that section 1 applies only to future cardrooms.

Dykes next argues that section 2 is preempted in its entirety by RCW 9.46.295. The city agrees that state law preempts the phasing out of the activities in subpart F, section 2. We, too, conclude that state law preempts the entirety of section 2 because it regulates, rather than prohibits gambling outright.

Section 2 states in pertinent part,

> All land uses operating social card games which are currently in existence within the City, which were legally established under land use regulations in effect at the time of the establishment, and which have current gambling licenses issued by the State Gambling Commission may continue to operate at a current level provided that such level is authorized by the current gambling license. All such land uses operating social card games:
>
> A. Shall be considered legal nonconforming uses under this act.
>
> B. Shall not be expanded or intensified by the addition of tables at which social card games are played beyond the numbers authorized by current gambling license.

---

[28] (Emphasis added.)

C. Shall permanently cease operations upon revocation or failure to renew license issued by the Washington State Gambling Commission.

D. Shall permanently cease operation of any table for social card games where operation is discontinued for more than 30 days.

E. Shall permanently cease operation if site or tables for social card games are relocated, reconstructed or redeveloped.

F. Shall permanently cease operation five years after this ordinance is enacted.

The trial court determined that subparts A, C, D, and E were preempted by state law. Neither party challenges that conclusion on appeal. Accordingly, subparts B and F only are at issue.

RCW 9.46.295 allows cities only to "absolutely prohibit, but . . . not change the scope of license, any or all of the gambling activities for which the license was issued." Instituting a schedule to phase out existing gambling activities is not absolutely prohibiting gambling activities. Rather, it is regulation. We also agree that Dykes and the city are correct that differentiating between existing and future uses is more regulatory in nature, thus violating RCW 9.46.295. We conclude that state law preempts the phase out schedule in subpart F.

Dykes argues that all of Section 2 changes the scope of his license, in violation of RCW 9.46.295, because it purports to do that which the Gambling Commission has the sole authority to do—regulate the scope of gambling activities. This argument is persuasive. The introductory paragraph of section 2 gives special authorization for existing cardroom activities to continue. RCW 9.46.295 does not give municipalities the authority to prohibit selectively gambling activities. Specifically, the ordinance authorizes these gambling activities to continue to operate at their "current level." But any regulation pertaining to the scope of gambling activities is under the sole authority of the Gambling Commission. If gambling activities continue, it is in the sole discretion of the Gambling Commission whether to allow

expansion, intensification, or the revocation of a license. Similarly, subparts A through F, of which subpart B is a part, attempt to regulate the scope of gambling, rather than merely prohibiting it. We conclude that state law preempts the entirety of section 2.

## VESTED RIGHT TO CARDROOM

Dykes next argues that Ordinance 3328 violates a vested right to operate a cardroom in conjunction with Marty's eating and drinking establishment. Specifically, Dykes argues that the February 2000 filing of the building permit application to remodel the establishment vested a constitutional right to operate under land use regulations then in effect. Accordingly, Dykes maintains that the later enactment of the ordinance does not bar expansion of the cardroom. We hold that any claim to a vested right by virtue of the filing of the application for a permit was extinguished by the city's later exercise of its police power by enactment of the ordinance.

"Under Washington's 'vested rights doctrine' developers who file a timely and complete building permit application obtain a vested right to have their application processed according to the zoning and building ordinances in effect at the time of the application."[29] The purpose of the vested rights doctrine is to "fix" the rules that will govern land development with reasonable certainty.[30]

■■■ But the vested rights doctrine does not allow a business to operate exempt from later-enacted police power regulations in furtherance of a legitimate public goal.[31] "This doctrine provides only a right to have the application processed under existing rules; it does not provide a right to

---

[29] *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, 136 Wn.2d 1, 16, 959 P.2d 1024 (1998) (citing *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986)); RCW 19.27.095.

[30] *W. Main*, 106 Wn.2d at 51.

[31] *W. Main*, 106 Wn.2d at 53 (citing *Hass v. City of Kirkland*, 78 Wn.2d 929, 481 P.2d 9 (1971)).

have any particular law or regulation apply to the location or use after the application is approved."[32] The development must then comply with later-enacted police power regulations that are limited only by constitutional safeguards.[33]

Dykes argues that the filing of a building permit application to remodel the eating establishment vested a constitutional right to operate under the land use regulations in place at the time. This argument suggests that filing for expansion of the cardroom license with the commission and the land use application for expanding the cardroom somehow created a vested right to operate a cardroom.

Although Dykes characterizes his claim as one to a "vested right," we need not decide whether Dykes had such a right by the filing of his application. Assuming without deciding that Dykes had such a right, "[m]unicipalities can regulate or even extinguish vested rights by exercising the police power reasonably and in furtherance of a legitimate public goal."[34] For example, the court in *West Main Associates v. City of Bellevue* observed, "under the State Environmental Policy Act of 1971 a municipality has the discretion to deny an application for a building permit because of adverse environmental impacts even if the application meets all other requirements and conditions for issuance."[35] Here, we have a statute that allows municipalities to prohibit all gambling and a valid exercise of the city's police power under that statute.

Dykes fails to address why this reasoning does not apply here. Dykes filed a building permit application that disclosed his plan to expand the cardroom at Marty's. The city approved the application. Six months later the city, in a valid exercise of its police power, and under the statutory

[32] *Skamania County v. Woodall*, 104 Wn. App. 525, 537, 16 P.3d 701, *review denied*, 144 Wn.2d 1021 (2001).

[33] *Rhod-A-Zalea*, 136 Wn.2d at 16.

[34] *W. Main*, 106 Wn.2d at 53.

[35] *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 53, 720 P.2d 782 (1986).

authority of RCW 9.46.295, banned all cardrooms in the city. Dykes does not challenge RCW 9.46.295. Any vested right Dykes may have had was extinguished with the passage of Ordinance 3328.

Dykes misplaces reliance on *Noble Manor Co. v. Pierce County*.[36] In that case, a developer argued that its right to develop its land in the manner described in its short plat application vested on the same day as the short plat application itself.[37] Subsequent development regulations would have made it impossible for the developer to develop the land as contemplated on the day the application for short platting was filed.[38] The Court held that the vested rights doctrine, and its codification in the short plat context in RCW 58.17.033, included the right to develop consistent with the land use and zoning laws in place on the day the county received the short plat application.[39]

*Noble Manor* is distinguishable. There, the court applied the vested rights doctrine to preserve a developer's expectations as to land use ordinances *existing* at the time of the application. The case does nothing to overcome the rule articulated in *West Main* that a police power regulation *subsequent* to an application can extinguish a vested right.

Finally, we need not address the city's argument that WAC 230-04-175 controls the question of whether Dykes had a vested right. It states, "[t]he issuance of any license by the commission shall not be construed as granting a vested right in any of the privileges so conferred." The city claims this language is broad enough to require its application here, in the land use and vested rights context.

The trial court did not err in granting summary judgment to the city on this issue.

---

[36] 133 Wn.2d 269, 943 P.2d 1378 (1997).

[37] *Noble Manor*, 133 Wn.2d at 274.

[38] *Noble Manor*, 133 Wn.2d at 272.

[39] *Noble Manor*, 133 Wn.2d at 278.

TAKINGS

Dykes contends that because Ordinance 3328 does not advance a legitimate state interest, it constitutes a taking under the Washington State and United States Constitutions. Dykes fails to persuade us that any unconstitutional taking of property occurred in this case.[40]

*Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994), establishes the revised analysis for a takings challenge following *Lucas v. South Carolina Coastal Council*[41] and our state's previous jurisprudence set forth in *Presbytery of Seattle v. King County*.[42] The case authority establishes two threshold questions. First, whether the regulation destroys or derogates any fundamental attribute of property ownership, including the right to possess, to exclude others, to dispose of property, or to make some economically viable use of the property.[43] If the landowner claims less than a "physical invasion" or a "total taking" and if a fundamental attribute of ownership is not otherwise implicated, we proceed to the second question. That question is whether the challenged regulation safeguards the public interest in health, safety, the environment, or the fiscal integrity of an area or whether the regulation " 'seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit.' "[44]

If the answer to both threshold questions is no, then there is no taking. If the answer to one or both questions is yes,

---

[40] Dykes fails to brief the *Gunwall* factors, and does not argue that the state constitutional provisions of article I, section 16 are more protective than the federal constitutional provisions. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). Accordingly, we follow the same analysis applied in *Guimont v. Clarke* and other cases. *See Guimont v. Clarke*, 121 Wn.2d 586, 602-04, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994).

[41] 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992).

[42] 114 Wn.2d 320, 787 P.2d 907 (1990); *see Guimont*, 121 Wn.2d at 600.

[43] *Guimont*, 121 Wn.2d at 602.

[44] *Guimont*, 121 Wn.2d at 603 (quoting *Robinson v. City of Seattle*, 119 Wn.2d 34, 49, 830 P.2d 318 (1992)).

then additional analysis is required. This additional analysis includes consideration of two additional points. First, whether the regulation advances a legitimate state interest. Second, a balancing test to determine if the state interest in the regulation is outweighed by its adverse economic impact to the landowner, with particular attention to the regulation's economic impact on the property, the extent the regulation interferes with investment-backed expectations, and the character of the government action.[45]

Dykes does not argue that the ordinance imposes the burden of providing an affirmative public benefit. Nor does he argue that all economic value has been taken or that he has been deprived of an attribute of ownership. Rather, Dykes challenges whether the ordinance is a legitimate exercise of power for the public interest in health, safety, or welfare.

Dykes argues that nothing in the record suggests that the ordinance was motivated by any concern that cardrooms lead to "negative secondary impacts" on the community. This assertion is at odds with the record, as we previously observed in this opinion. The council president indicated that half of the people he spoke with found gambling to be offensive. Another council member said she too found that half of the citizens she talked to did not want cardrooms in the city. Furthermore, Dykes fails to account for the fact that RCW 9.46.295 allows municipalities to "absolutely prohibit" gambling activities. Dykes concludes that in order to justify the cardroom ban, the city must demonstrate that the prohibition implements the public policy of "keep[ing] the criminal element out of gambling" or "restrain[ing] . . . professional gambling activities" as discussed in RCW 9.46.010. This argument makes no sense. The city cannot regulate professional gambling or the criminal element in gambling. The city is limited only to absolutely prohibiting gambling activities or doing nothing at all, under RCW 9.46.295.

[45] *Guimont*, 121 Wn.2d at 604.

Because the ordinance protects the public health, safety, and welfare and neither destroys a fundamental attribute of ownership nor imposes a private burden for a public benefit, no taking has occurred. Accordingly, we proceed to determine whether the regulation violates substantive due process.[46]

## SUBSTANTIVE DUE PROCESS

Dykes argues that Ordinance 3328 violates his substantive due process rights because it fails the due process test of reasonableness. Again, we disagree.

"Even if a regulation is not susceptible to a takings challenge, under our *Presbytery* framework, it is next subject to substantive due process scrutiny for reasonableness."[47] Washington courts apply the three-pronged test stated in *Presbytery* to determine whether a regulation violates substantive due process. There the court stated the test as "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner."[48] The purpose of this analysis is to prevent the use of excessive police power that would require an individual " 'to shoulder an economic burden, which in justice and fairness the public should rightfully bear.' "[49] Legislative enactments are presumed constitutional, and the challenging party bears the burden of proving beyond a reasonable doubt that they are unconstitutional.[50]

Dykes maintains that Ordinance 3328 fails any constitutional reasonableness test because it does not

---

[46] *See Guimont*, 121 Wn.2d at 594.

[47] *Guimont*, 121 Wn.2d at 608.

[48] *Presbytery*, 114 Wn.2d at 330.

[49] *Weden*, 135 Wn.2d at 706 (quoting *Orion Corp. v. State*, 109 Wn.2d 621, 648-49, 747 P.2d 1062 (1987)).

[50] *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 869, 872 P.2d 1090 (1994).

achieve a legitimate public purpose. As noted above, this argument is not persuasive. Based on the evidence presented at the council meeting, there was a significant public interest in prohibiting gambling in the city. The ordinance was a legitimate expression of this public interest. Dykes's arguments that some studies find little peripheral crime associated with cardrooms are insufficient to overcome the presumption that this regulation is constitutional. Furthermore, in light of the historical acceptance of the regulation of gambling as a valid exercise of the police power,[51] and the explicit authorization by the legislature in RCW 9.46.295 to permit municipalities to prohibit gambling absolutely, this argument must fail.

As to the second prong, Dykes argues that the city has many options to address its concerns about gambling. This is not true. The city can either prohibit gambling activities or do nothing under RCW 9.46.295. Furthermore, Dykes fails to address how a prohibition on cardrooms is not a reasonably necessary means to achieve the public purpose of stopping cardroom activity.

Finally, Dykes argues that the ordinance is unduly oppressive. To determine whether a regulation is unduly oppressive on the landowner, courts must balance the public's interests against those of the regulated landowner. The *Presbytery* court listed several interests for the courts to consider, including the nature of the harm sought to be avoided, the availability and effectiveness of less drastic protective measures, the economic loss suffered by the property owner, and the property owner's ability to anticipate the regulation.[52]

Applying these factors, we conclude that the prohibition on gambling is not unduly oppressive. The public has a significant interest in abating an activity that many find to be offensive or damaging to the community. That the

---

[51] *See Weden*, 135 Wn.2d at 691.

[52] *Girton v. City of Seattle*, 97 Wn. App. 360, 368, 983 P.2d 1135 (1999) (citing *Presbytery*, 114 Wn.2d at 331), *review denied*, 140 Wn.2d 1007 (2000).

community perceived gambling to be a significant problem is supported by the fact that the ordinance was brought about through a citizen initiative. No less restrictive means are available because RCW 9.46.295 allows municipalities to either totally prohibit gambling or to not act at all. Municipalities are not allowed to simply regulate particularly offensive aspects of gambling. Dykes has failed to address what, if any, economic losses he has suffered due to the ordinance. Furthermore, Dykes is not being required to bear a financial burden or solve a social problem that is not created by gambling itself. As observed in *Weden*, "[i]t defies logic to suggest an ordinance is unduly oppressive when it regulates only the activity which is directly responsible for the harm."[53] Finally, Dykes should have anticipated the ordinance because he knew that, under RCW 9.46.295, the possibility existed for the city to prohibit gambling activities.

Nevertheless, Dykes maintains that the destruction of a legitimate business is unduly oppressive. Dykes cites to *City of Seattle v. McCoy*.[54] *McCoy* is distinguishable.

In *McCoy*, the trial court found a restaurant to be a drug nuisance under chapter 7.43 RCW because of the drug activity that was taking place on the property, despite the owners' best efforts to stop it.[55] This court reversed and concluded that the drug nuisance statute, as applied, constituted a taking and violated due process.[56] But the cardroom at Marty's is not being shut down due to activities outside of Dykes's control. It is being closed because the city has decided that it does not want cardrooms. The ordinance does not require that Marty's, a restaurant, bar and cardroom, be closed completely. Dykes's attempt to equate Marty's to the restaurant in *McCoy* is not persuasive. We conclude that there is no substantive due process violation.

[53] *Weden*, 135 Wn.2d at 707.

[54] 101 Wn. App. 815, 4 P.3d 159 (2000).

[55] *McCoy*, 101 Wn. App. at 823.

[56] *McCoy*, 101 Wn. App. at 844.

PROCEDURAL DUE PROCESS

Dykes also argues that the city should have given him special notice and a hearing because this was a quasi-judicial action. We reject this claim as well.

 Both the Washington and United States Constitutions provide that no person shall be deprived of "life, liberty, or property, without due process of law."[57] State deprivation of these protected interests is unconstitutional unless accompanied by adequate procedural safeguards.[58] Our Supreme Court has held that our due process protection is largely coextensive with that of the United States Constitution.[59]

 In looking at the degree of process that will be afforded, the court balances the following interests: (1) the private interest to be protected, (2) the risk of erroneous deprivation of that interest by the government's procedures and the probable value of additional or substitute procedural safeguards, and (3) the government's interest in maintaining the procedures.[60]

The private interest here is Dykes's interest in maintaining the cardroom facility within the bar and restaurant at Marty's. Despite Dykes's characterization, the ordinance does not result in the complete termination of his business. The space planned for the expanded cardroom could be used for many other functions, and the restaurant and bar remain unaffected.

 The risk of erroneous deprivation is low because the ordinance was the product of a citizen initiative that prohibited cardroom gaming throughout the city. Despite

---

[57] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3.

[58] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

[59] State v. Manussier, 129 Wn.2d 652, 679-80, 921 P.2d 473 (1996), cert. denied, 520 U.S. 1201 (1997).

[60] Rivett v. City of Tacoma, 123 Wn.2d 573, 583, 870 P.2d 299 (1994) (quoting Morris v. Blaker, 118 Wn.2d 133, 144-45, 821 P.2d 482 (1992) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976))).

Dykes's characterization to the contrary, this was not a quasi-judicial action, but a legislative one. Areawide actions involving the exercise of the legislative body's policy-making power are generally legislative.[61] The legislative process provides all the process that is due.[62] "And such actions are not made quasi-judicial simply because they affect specific individuals, even if the method chosen by the legislative body to acquire input from property owners allows the owners to specifically discuss their own properties."[63]

Similarly, the government's interest in maintaining the procedure, the citizen initiative process, is quite high. It would be unduly burdensome on the city to provide an individualized hearing for each party affected by a citywide, legislative enactment. Thus, Dykes was entitled to no more process than he received in this legislative action by the city.

Dykes next argues that because the ordinance affects land uses, the city was required to comply with the public participation requirements of the Growth Management Act in RCW 36.70A.035. There is no indication in the record that Ordinance 3328 is Growth Management Act legislation. The ordinance was promulgated under the authority of RCW 35.17.260, not chapter 36.70A RCW. RCW 36.70A.035 is not applicable.

In sum, we conclude that Ordinance 3328 does not violate Dykes's procedural due process rights.

We affirm the summary judgment order in part and reverse in part.

BECKER, C.J., and SCHINDLER, J., concur.

---

[61] *Holbrook, Inc. v. Clark County*, 112 Wn. App. 354, 365, 49 P.3d 142 (2002), *review denied*, 148 Wn.2d 1017 (2003).

[62] *In re Pers. Restraint of Metcalf*, 92 Wn. App. 165, 176, 963 P.2d 911 (1998), *cert. denied*, 527 U.S. 1041 (1999).

[63] *Holbrook*, 112 Wn. App. at 365.