[No. 54683-0-I. Division One. December 5, 2005.]

THE CITY OF DES MOINES, *Appellant*, v. GRAY BUSINESSES, L.L.C., *Respondent*.

*Michael C. Walter* and *Jeremy W. Culumber* (of *Keating Bucklin & McCormack, Inc., P.S.*) and *Linda Marousek, City Attorney*, and *Richard S. Brown, Assistant*, for appellant.

*Patrick J. Schneider* and *Susan E. Drummond* (of *Foster Pepper & Shefelman, P.L.L.C.*), for respondent.

¶1 AGID, J. — Gray Businesses, L.L.C. (Gray), has owned the Pine Terrace Trailer Village (Pine Terrace) in Des Moines for over 30 years. Pine Terrace operated as a legal nonconforming use for most of that time. On February 10, 2000, the community development director for the city of Des Moines (City) sent a letter notifying Gray that it could no longer fill vacant mobile home spaces at Pine Terrace because the City had discovered that Gray never submitted the site plan required by a 1992 ordinance (site plan regulation). Gray eventually filed a regulatory takings claim, alleging that the City's action terminated its nonconforming use, which in turn denied Gray its fundamental right to lease its land. The parties filed cross-motions for summary judgment on the taking issue, and the King County Superior Court granted Gray's motion. The court then awarded Gray the $295,000 damages it requested as well as almost $70,000 in attorney fees. The City appeals the summary judgment ruling, the calculation and award of damages, and the attorney fee award.

¶2 Because the site plan regulation was a valid exercise of the City's police power, and the City's application of the

site plan regulation to Pine Terrace did not destroy or derogate a fundamental attribute of Gray's ownership, there was no regulatory taking. The trial court should have granted the City's summary judgment motion, so we reverse and remand for entry of judgment for the City.

## FACTS

¶3 Pine Terrace is a mobile home park that has been in its current location on Pacific Highway South in Des Moines since before 1960 when the area was in unincorporated King County. In 1973, Gray purchased Pine Terrace and continued operating it as a mobile home park. In 1974, the city of Des Moines annexed the area. In 1986, Des Moines established a "Highway Commercial Zone" around Pacific Highway South that included Pine Terrace. Mobile home parks are not a permitted use in the zone, but the City allowed Gray to continue operating as a legal nonconforming use.[1]

¶4 On May 7, 1992, the City adopted Ordinance No. 938 amending various building and construction codes. Section 154 of the ordinance required preexisting mobile home parks to submit a site plan as a prerequisite for obtaining or renewing a City business license.[2] Section 155 stated that all preexisting mobile home parks that were in compliance with City ordinances at the time they were established

> shall be legal, nonconforming uses and shall be entitled to the number of mobile homes which was permitted by the applicable ordinance in effect at the time the mobile home park was established; provided, however, that no increase in density or change in the location of any mobile home shall be allowed unless all the provisions of this Chapter are met.

¶5 On September 24, 1992, the City passed Ordinance No. 978, amending section 155. It provided that all preex-

---

[1] The parties dispute exactly when Pine Terrace became a nonconforming use, but both agree it was nonconforming during the events pertinent to this case.

[2] Section 154 is now codified as DES MOINES MUNICIPAL CODE 14.48.270.

isting mobile home parks in compliance with codes at the time of their establishment

shall be legal, nonconforming uses and are entitled to the number of mobile homes which was permitted by the applicable ordinance in effect at the time the mobile home park was established, the number of individual spaces which are provided for placement of a mobile home for dwelling unit purposes existing on July 1, 1992, and the privilege of locating in such spaces mobile homes of a size suitable to the dimensions of the individual spaces which are provided for mobile home placement; provided:

A. The owner of the mobile home park shall provide the city of Des Moines planning department within ninety days of the effective date of this ordinance a plan or schematic of the mobile home park drawn to scale, showing the location and dimension of each space for the placement of mobile homes,

B. All other provisions of this Mobile Home Park Regulation Code shall be applicable, and

C. No increase in density and no increase in the number of mobile homes are allowed unless all of the provisions of this chapter are met.

Ordinance Nos. 938 and 978 were published as required by law and codified in the Des Moines Municipal Code (DMMC) as chapter 14.48 DMMC. Section 154 is now codified as DMMC 14.48.270 and section 155 is 14.48.280.[3] Although Gray never submitted a site plan, the City continued to renew its business license and issue "move-on" permits for replacement mobile homes at Pine Terrace.[4]

¶6 In April 1999, the City established a six-month moratorium on land use permits in the new "Pacific Ridge" zone, which included Pine Terrace. In early 2000, City staff asked whether the permit moratorium applied to move-on permits for mobile homes. The Community Development Director, Judith Kilgore, and the City Attorney, Gary McLean, con-

---

[3] The City did not specifically notify Des Moines area mobile home park owners of the ordinance, and Gray contends it was unaware of the site plan requirement until 2000. But there is no requirement that the City specifically notify property owners of a change in the law.

[4] "Move-on" permits are building permits that allow mobile homes to move into a mobile home park.

cluded that the moratorium did apply to move-on permits. They also discovered that Gray had never submitted the required site plan and the City had been improperly renewing its business license and approving move-on permits since 1992. On February 10, 2000, Kilgore wrote Gray a letter about the problem:

> More importantly, we regret to inform you that your Mobile Home Park does not appear to be a permitted use under the zoning and building codes of the City of Des Moines. This is not in any way related to the moratorium. Instead, our records indicate that your Mobile Home Park never satisfied specific conditions which could have qualified the park as a "legal, nonconforming use", generally allowing the park to maintain the number of mobile homes on the site as of July 1, 1992. These conditions were established in Ordinance Nos. 938 and 978, adopted in 1992 and now codified as DMMC 14.48.280. Specifically, our department records do not show that you or any previous owner of the Mobile Home Park ever filed a plan or schematic drawing of the park with the Community Development Department at any point before the deadline for qualifying as a legal, nonconforming use. That date was December 28, 1992. . . .
>
> . . . .
>
> Without affirmative proof that you or a previous owner satisfied the filing requirement found in DMMC 14.48.280, no additional mobile homes can be located in your mobile home park. Additionally, no mobile homes will be permitted to come onto the site to replace any preexisting mobile homes that might be moved away.

¶7 In March or April of 2000, Gordon Gray and his attorney met with Kilgore, McLean, and City Planner Corbitt Loch. Kilgore and McLean stood by the statements in the letter. Over the next two years, Gray attempted to reach a resolution with the City about the continuing use of Pine Terrace while unsuccessfully marketing the property. On August 9, 2002, in a matter unrelated to the site plan regulation, the City filed an eminent domain petition seeking to condemn a seven-foot-wide strip of land running along Pine Terrace as part of the Pacific Highway South

Improvement Project. Gray filed a counterclaim alleging a regulatory taking of its property from the time of the February 10, 2000 letter from Kilgore.

¶8 On August 26, 2003, the City moved for summary judgment on Gray's regulatory taking counterclaim. On October 6, Gray cross-moved for summary judgment on the same issue. On December 9, the trial judge issued a letter ruling granting Gray's summary judgment motion. The parties settled the eminent domain valuation, so the only issue left for trial was the amount of damages for the regulatory taking. Gray hired a mobile home park appraiser who calculated the damages from the taking. Based on vacant park spaces, he testified Gray's damages were $295,000. The trial court awarded Gray that amount. After trial, Gray moved for attorney fees under RCW 8.25.075, and over the City's objections, the trial court awarded the full amount Gray requested: $69,285.71.

## DISCUSSION

¶9 This case is before us on summary judgment, presenting only questions of law. Our review is de novo.[5] Gray alleges a regulatory taking, arguing that the City's application of its site plan regulation to Pine Terrace terminated its nonconforming right to lease mobile home spaces to new tenants, thereby destroying its right to lease property—a fundamental attribute of property ownership. It contends that because the City destroyed a fundamental attribute of ownership, under *Manufactured Housing Communities of Washington v. State*,[6] it effected a per se taking and no further analysis is required. The City argues that it did not deny Gray a fundamental attribute of property ownership. In the alternative, it asserts that it was properly exercising its police power, so the court should have done a full regulatory taking analysis under which the City prevails as

---

[5] *Eggleston v. Pierce County*, 148 Wn.2d 760, 766 n.4, 64 P.3d 618 (2003) (citing *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994)).

[6] 142 Wn.2d 347, 13 P.3d 183 (2000).

a matter of law. We agree with the City. Gray and the trial court mischaracterized the City's application of the site plan regulation to Pine Terrace, analyzing it as if it were an exercise of eminent domain rather than of the police power. We recognize that the City's actions caused Gray significant hardship. We have not gone into the history of the conflict between the City and Gray because it is not relevant to the regulatory taking issue. But while Gray may have claims under theories not before us, such as procedural and substantive due process or tortious interference, its claim here does not qualify as a taking under Washington law.[7]

■■ ¶10 The threshold question in any taking claim is whether the government action is an exercise of its eminent domain power or its police power. The power of eminent domain allows the City to take real property for public use, provided it justly compensates the owner.[8] The police power allows the City "to regulate for the health, safety, morals, and general welfare, and the burdens imposed incidental to such regulations are not takings unless the burdens manifest in certain, enumerated ways."[9]

Police power and the power of eminent domain are essential and distinct powers of government. Courts have long looked behind labels to determine whether a particular exercise of power was properly characterized as police power or eminent domain. But clearly, not every government action that takes, damages, or destroys property is a taking. "Eminent domain takes private property for a public use, while the police power regulates its use and enjoyment, or if it takes or damages it, it

---

[7] See Eggleston, 148 Wn.2d at 766. The dissent's argument on Gray's behalf supports a substantive due process claim, not a claim for a regulatory taking. As the Supreme Court made clear in Guimont v. Clarke, 121 Wn.2d 586, 594, 854 P.2d 1 (1993), cert. denied, 510 U.S. 1176 (1994), these are two distinct theories. Gray did not plead or argue that the City's actions violated its substantive due process rights. So the facts on which the dissent relies simply do not apply to Gray's regulatory taking claim.

[8] WASH. CONST. art. I, § 16. Section 16 provides that private property shall not be taken for "public or private use" without just compensation.

[9] Eggleston, 148 Wn.2d at 767.

is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public."[10]

¶11 When an alleged taking results from an exercise of eminent domain, usually because the municipality physically occupies the property, the only question is whether a public entity took private property for a public use. If it did, the analysis ends there, and the public entity must pay compensation.[11] But when a property owner alleges a taking based on an exercise of the police power, we must determine whether the regulation "goes too far" and thus requires compensation.[12] A regulation goes too far when it "becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession."[13] In an "as applied" challenge, which Gray alleges here, "the court must engage in 'ad hoc, factual inquires' into the particular economic impact of the regulation on specific property under that case's unique circumstances."[14]

¶12 Gray relies heavily on the Supreme Court's opinion in *Manufactured Housing*. There, a state statute gave mobile home park tenants a right of first refusal to buy the park where they lived.[15] A group of park owners challenged the statute on its face, arguing it was an unconstitutional taking. The Washington Supreme Court held that "the power to grant a right of first refusal is part and parcel of the power to dispose of property."[16] It went on

[10] *Id.* at 767-68 (emphasis, footnote, and citations omitted) (quoting *Conger v. Pierce County*, 116 Wash. 27, 36, 198 P. 377 (1921)).

[11] *See id.*

[12] *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922) ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").

[13] *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 199, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985).

[14] *Guimont*, 121 Wn.2d at 596 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987)).

[15] 142 Wn.2d at 352.

[16] *Id.* at 366.

to conclude that the statute fell within the rule that a taking occurs "where a regulation deprives the owner of a fundamental attribute of property ownership."[17] It is significant to our analysis here that the *Manufactured Housing* court was persuaded that there was a taking because the private property right of first refusal was transferred to a private party by statute for a public purpose.[18] The court noted the differences between an exercise of the police power and an exercise of eminent domain:

> "When restrictions upon the ownership of private property fall into the category of "proper exercise of the police power," they, validly, may be imposed without payment of compensation. The difficulty arises in deciding whether a restriction is an exercise of the police power or an exercise of the eminent domain power. When private property rights are actually destroyed through the governmental action, then police power rules are usually applicable. But, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable."[19]

The court concluded that the actual effect of the statute was "more closely akin to the exercise of eminent domain, and not the police power, because the property right is not only taken, but it is statutorily transferred to a private party for an alleged public use."[20]

¶13 Instead of making a facial challenge like the park owners in *Manufactured Housing*, Gray challenges only the City's application of the site plan regulation to Pine Terrace. Gray does not dispute that the regulation itself was a valid exercise of the City's police power.[21] Kilgore's letter

---

[17] *Id.* at 369.

[18] *Id.*

[19] *Id.* (emphasis and citation omitted) (quoting *Ackerman v. Port of Seattle*, 55 Wn.2d 400, 408, 348 P.2d 664 (1960)).

[20] *Id.*

[21] Nonconforming uses are subject to later-enacted reasonable police power regulations. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962); *Manufactured Housing*, 142 Wn.2d at 369; *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, 136 Wn.2d 1, 7, 959 P.2d 1024 (1998).

notified Gray that as a consequence of its noncompliance with the site plan regulation, no new mobile home tenants would be allowed to move onto the property. This effectively terminated Gray's ability to lease vacant spaces on his property for mobile home use. But, unlike the statute at issue in *Manufactured Housing*, the City did not confer Gray's private property rights to anyone, and certainly not "to a private party for an alleged public use."[22] The analysis in *Manufactured Housing* does not apply to the City's actions in this case.

¶14 Thus, we must analyze this case as a challenge to the City's exercise of the police power. The City's application of the regulation to Gray's property does not require compensation unless it (1) actually impacted Gray's property rights and (2) went "too far" in doing so.[23] When the impact of a regulation is at issue, the analysis does not end after answering the first inquiry in the affirmative. We must also determine whether the City's application of the site plan regulation to Pine Terrace went too far and thus was a compensable taking.

*Regulatory Taking*

¶15 *Guimont v. Clarke*,[24] which incorporated the nuances of *Lucas v. South Carolina Coastal Council*[25] into Washington's *Presbytery*[26] approach, provides the analytical framework for a regulatory taking claim in Washington. First, the court asks whether the regulation destroys or derogates a fundamental attribute of property ownership, including the right to possess, to exclude others, to dispose of property, or to make some economically viable use of the

---

[22] 142 Wn.2d at 369. Nor did the City transfer Gray's property rights to a private party for a private use.

[23] *Eggleston*, 148 Wn.2d at 768 n.6 (citing *Mahon*, 260 U.S. 393).

[24] 121 Wn.2d 586, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994).

[25] 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992).

[26] *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990).

property.[27] If so, there is a per se taking. Similarly, there is a per se taking if the plaintiff proves a "physical invasion" or "total taking"[28] of its property. In either case, just compensation is required.[29] If a property owner alleges less than a "physical invasion" or "total taking," and "a fundamental attribute of ownership is not otherwise implicated," the court proceeds to the second threshold question.[30] That question is "whether the challenged regulation safeguards the public interest in health, safety, the environment or the fiscal integrity of an area, or whether [it] . . . 'seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit'."[31] If the challenged regulation is merely a safeguard, there is no taking and the analysis ends. If, on the other hand, it *imposes an onerous burden for the public benefit, there may be a compensable taking and further analysis is required.*[32]

¶16 Gray does not argue that the site plan regulation fails to substantially advance a legitimate state interest.[33] Thus, in this as-applied challenge, we go to the final step in the analysis which requires the court to balance the State's interest against the regulation's adverse impact on the property owner.[34] We consider the regulation's impact on the property, the extent the regulation interferes with

---

[27] *Guimont*, 121 Wn.2d at 602.

[28] A "total taking" occurs where a regulation denies a landowner " 'all economically beneficial or productive use of land.' " *Id.* at 598 (quoting *Lucas*, 505 U.S. at 1015).

[29] *Id.* at 602-03.

[30] *Id.* at 603.

[31] *Id.* (quoting *Robinson v. City of Seattle*, 119 Wn.2d 34, 49, 830 P.2d 318, *cert. denied*, 506 U.S. 1028 (1992)).

[32] *Edmonds Shopping Ctr. Assocs. v. City of Edmonds*, 117 Wn. App. 344, 362-63, 71 P.3d 233 (2003).

[33] In *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543, 125 S. Ct. 2074, 2084, 161 L. Ed. 2d 876 (2005), the Supreme Court essentially eliminated this factor, but that may or may not change the analysis under article I, section 16 of our Constitution.

[34] *Guimont*, 121 Wn.2d at 595-96 (citing *Keystone*, 480 U.S. at 495). An as-applied challenge involves application of the regulation to specific property, rather than a challenge to the regulation as a whole. *Id.* at 595.

investment-backed expectations, and the character of the government action.[35]

*Fundamental Attribute*

 ¶17 Gray argues that the City deprived it of a fundamental attribute of its ownership of Pine Terrace when it prohibited new move-on permits for mobile homes.[36] Gray characterizes this as a termination of its nonconforming use. It asserts that a mobile home park owner's right to lease vacant spaces is just as important, if not more so, than the right of first refusal held to be a fundamental attribute of property ownership in *Manufactured Housing*. The City argues that it did not terminate Gray's right to lease because Pine Terrace continued functioning as a mobile home park. It further contends that although the right to lease one's property is a fundamental attribute of ownership, the right to lease one's property for any purpose he or she desires is not.

¶18 The City's argument that it did not destroy Gray's right to lease Pine Terrace for mobile home use is not persuasive. By prohibiting Gray from leasing any vacant mobile home spaces, the City would eventually have made it economically impossible for Pine Terrace to continue as a mobile home park. That Gray could continue leasing to existing tenants did not change the ultimate impact because ever-increasing vacancies are inevitable.[37] But even assuming the City destroyed Gray's right to lease property *for mobile home use*, that specific right is not a fundamental attribute of ownership.

 ¶19 The statute in *Manufactured Housing* " 'simply appropriate[d] an owner's right to sell his property to

---

[35] *Id.* at 596 (citing *Presbytery*, 114 Wn.2d at 335-36; *Robinson*, 119 Wn.2d at 51).

[36] Gray does not contend that the City's site plan regulation fails to safeguard the public interest in health and safety, or that the regulation burdens it with providing an affirmative public benefit.

[37] The City began allowing Gray to lease to new tenants again in late 2003.

persons of his choice.' "[38] "[T]he right to grant first refusal is a part of 'the bundle of sticks' which the owner enjoys as a vested incident of ownership."[39] That is not the case here because Gray conflates an owner's inherent right to sell or lease its property to anyone it chooses with its contingent right to use or lease its property for any *purpose* it desires. The right to use and lease property for mobile homes is derived from and limited by state statute and local regulations.[40] An owner must have a business license and comply with applicable regulations before it can be said to have a "right" to lease its property for mobile home use.[41] Because the ability to use or lease property for mobile home use is contingent, it is not a part of the "bundle of sticks" which the owner enjoys as a vested incident of ownership. It is thus not a fundamental attribute of ownership. Here, the City limited Gray's right to lease Pine Terrace for mobile home use because Gray did not comply with its admittedly legitimate site plan regulation. While the course of negotiations between the City and Gray may raise concerns about the City's motives and methods, Gray's rights to operate as a nonconforming mobile home park are not a fundamental attribute of ownership, and Gray cannot establish a regulatory taking.

¶20 Even if the City had deprived Gray of a fundamental attribute of ownership and we reached the balancing test, Gray cannot establish it was overly burdened or that it was burdened to provide an affirmative public benefit. The site plan regulation itself had virtually no impact on Gray. Regulatory compliance required minimal effort and expense, and Gray offers no proof that the City prevented it from complying. Further, Gray offers no proof

---

[38] 142 Wn.2d at 368 (quoting *Gregory v. City of San Juan Capistrano*, 142 Cal. App. 3d 72, 88-89, 191 Cal. Rptr. 47 (1983)).

[39] *Id.* at 367 (emphasis and footnote omitted).

[40] *See, e.g.*, ch. 36.70A RCW (Growth Management Act); ch. 43.21C RCW (State Environmental Policy Act); ch. 14.48 DES MOINES MUNICIPAL CODE (Mobile Home Park Regulations), ch. 18 (Land Use Regulations).

[41] Ch. 14.48 DES MOINES MUNICIPAL CODE.

that its failure to comply with the regulation resulted in any economic loss because the City never denied a move-on permit for Pine Terrace after Kilgore's letter.[42] Without proof of actual damages caused by either the regulation itself or Kilgore's letter, Gray has not established that it has been burdened.

¶21 The City argues alternatively that Gray's claim is not ripe and that it failed to exhaust administrative remedies. We do not need to reach those issues because we have resolved the case on its merits. We reverse the trial court and remand for entry of summary judgment in favor of the City.

COLEMAN, J., concurs.

¶22 BECKER, J. (dissenting) — I respectfully dissent. I would hold that the City's abrupt and unlawful termination of Gray's lawful nonconforming use was a regulatory taking because it served no other purpose than to coerce Gray to sell his land for development.

¶23 In 1992, the city of Des Moines rezoned the area in which Gray's mobile home park is located. One ordinance adopted at the time allowed existing mobile home parks to continue as a nonconforming use. Another ordinance, No. 978, required the operators of existing mobile home parks to give the City a site plan showing the location and dimension of each mobile home site. The site plan was to be submitted within 90 days of the effective date of the ordinance. Gray, unaware of ordinance 978, did not submit a site plan. The City did not enforce the requirement.

¶24 For years, the City continued to issue "move-on" permits to mobile home owners who wished to rent one of the spaces in Gray's park. Suddenly, in February 2000, the City informed Gray through a letter from Judith Kilgore,

---

[42] The dissent argues that "no reasonable mobile home owner would bother to apply for a permit in a park where the City had categorically declared that none would be issued." Dissent at 622. But the evidence established that Gray and its agents told prospective tenants not to apply, so we will never know what the City would have done had it received an application.

community development director, that move-on permits would no longer be issued for Gray's park because of his failure to submit a site plan back in 1992. In effect, the City terminated Gray's right to operate Pine Terrace Trailer Village as a lawful nonconforming use.

¶25 Negotiations were fruitless. In August 2002 Gray filed suit alleging that ordinance 978, as applied to his property, was a taking without just compensation.

¶26 In late 2003, as the case was about to go to trial, the City passed another ordinance that allowed preexisting mobile home park owners such as Gray to submit a site plan and thereby gain reinstatement to legal nonconforming status.[43] As a result of this action, move-on permits could once again be issued, and Gray's claim became one for a temporary taking.

¶27 The trial court considered cross motions for summary judgment in November 2003. Gray primarily argued that by taking away his right to lease the empty trailer pads to new lessees, the City had destroyed an attribute of ownership as fundamental as the right of first refusal considered in *Manufactured Housing Communities of Washington v. State*, 142 Wn.2d 347, 13 P.3d 183 (2000). The court agreed that *Manufactured Housing* was analogous. The court granted summary judgment to Gray and awarded damages for the temporary taking.

¶28 The majority rejects Gray's theory of a per se taking. I agree with this aspect of the majority's analysis. Because Gray was not prevented from selling or leasing his property, he has not lost a fundamental attribute of ownership, and therefore the City's action is not a taking under *Manufactured Housing*. Further, the City's refusal to issue move-on permits was not tantamount to a physical invasion of Gray's property (*see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)). Nor was it a denial of all economically viable use of

---

[43] Clerk's Papers at 202. The passage of this ordinance implicitly recognizes that the effect of the site plan requirement, as interpreted and enforced by the Kilgore letter, was to terminate Gray's legal nonconforming use.

his property (*see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798(1992)).

¶29 But a government regulation that does not meet the criteria for a per se taking discussed in *Manufactured Housing, Loretto,* and *Lucas* may still amount to a compensable taking if it "goes too far." *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922). A regulation goes too far if it "goes beyond preventing real harm to the public which is directly caused by the prohibited use of the property and instead imposes on those regulated the requirement of providing an affirmative public benefit." *Guimont v. Clarke,* 121 Wn.2d 586, 603, 854 P.2d 1 (1993). *See also Presbytery of Seattle v. King County,* 114 Wn.2d 320, 333, 787 P.2d 907 (1990).

¶30 The majority concludes that the 1992 site plan regulation is not susceptible to this takings analysis because "Gray cannot establish it was overly burdened or that it was burdened to provide an affirmative public benefit. The site plan regulation itself had virtually no impact on Gray." Majority at 614.

¶31 If it were only a question of the burdens associated with submitting a site plan, I would agree. By itself, a site plan requirement is a simple, inexpensive, and well-accepted land use tool. But the regulatory act that Gray is concerned about is the City's decision in 2000 to penalize his failure to submit a site plan by preventing him from taking in any new tenants. Judith Kilgore's letter did not say that Gray would have to submit a site plan before any more new tenants were allowed to move in. Her letter said that no more new tenants would be allowed to move in, period. As the trial court reasoned, Judith Kilgore's letter of February 2000 informing Gray that move-on permits would no longer be issued "represented a complete (though possibly slow acting) one pad at a time termination of the right to operate as a legal nonconforming use."[44]

---

[44] Clerk's Papers at 505.

¶32 A lawful nonconforming use can be extinguished, but unless the owner has abandoned it the City must allow a reasonable amortization period to allow the owner to recoup on investment. *Univ. Place v. McGuire*, 144 Wn.2d 640, 648-49, 30 P.3d 453 (2001). "Although found to be detrimental to important public interests, nonconforming uses are allowed to continue based on the belief that it would be unfair and perhaps unconstitutional to require an immediate cessation of a nonconforming use." *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, 136 Wn.2d 1, 7, 959 P.2d 1024 (1998). As the trial court noted, the City extinguished Gray's nonconforming use without using its own abatement process, which requires notice, public hearings, findings, and an amortization period.[45] The site plan ordinance itself (No. 978) does not state that termination of an otherwise lawful nonconforming use will be a consequence of failure to submit a site plan before the 1992 deadline.

¶33 The question is whether the City's termination of Gray's legal nonconforming use status was merely a safeguard for the public interest, or whether it sought " 'less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit'." *Guimont*, 121 Wn.2d at 603 (quoting *Robinson v. City of Seattle*, 119 Wn.2d 34, 49, 830 P.2d 318 (1992)).

¶34 The City's decision to permanently shut off Gray's supply of new tenants was not merely a safeguard for the public welfare. To prevent any real harm to the public that was caused by Gray's failure to submit a site plan, all the City needed to do, once it became aware of the missing site plan, was to call Gray and ask him to bring one down to City Hall.

¶35 Did the City's sudden decision to extinguish the use of Pine Terrace as a mobile home park impose upon Gray " 'the requirement of providing an affirmative public benefit' "? Under *Guimont* the answer to this question must be

---

[45] DES MOINES MUNICIPAL CODE 18.48.090, set forth at Clerk's Papers at 270-71.

"yes" if the overly severe land use regulation is to be susceptible to a takings analysis; otherwise, the appropriate challenge is as a violation of substantive due process. *Guimont*, 121 Wn.2d at 594. *See also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082, 161 L. Ed. 2d 876 (2005) (the "common touchstone" of regulatory takings jurisprudence is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain"; all tests for a taking focus "directly upon the severity of the burden that government imposes upon private property rights").

¶36 In the record is Gray's declaration describing his negotiations with city officials after he received the Kilgore letter. At the first meeting, Gray protested that the City had not taken any of the steps that its own ordinances require to terminate a nonconforming use. According to Gray, the city attorney "did most of the talking at that meeting. He talked about the City's desire to see the Pine Terrace land developed in a manner that would be consistent with the new Pacific Ridge zoning that the City was adopting, and he wanted to know about our willingness to sell the park to a developer."[46] The city attorney specifically said "the City would like to see the park sold" and that if Gray could find a buyer for the park, and set a fixed date for terminating the mobile home park use, then he could do just about anything he wanted in the park until it was sold.[47] Later, according to Gray, the city attorney said that Gray would be allowed to rent spaces to new tenants "if I would enter into a written agreement with the City to sell the park to a developer, terminate the use by a specific date, and help the City move mobile homes from the spaces along Pacific Highway South that the City needed to take in order to expand the highway."[48]

---

[46] Clerk's Papers at 396.

[47] Clerk's Papers at 396.

[48] Clerk's Papers at 396.

¶37 Gray's takings theory is that the Kilgore letter of February 2000 was sent "in an effort to coerce Gray Businesses into selling Pine Terrace to a developer whom the City approved, who would then redevelop the property in a manner that was consistent with the City's new Pacific Ridge Zone for the area that included Pine Terrace."[49] His unrebutted account of the city attorney's comments, combined with the City's unlawful suspension of move-on permits, proves the theory and shows that the City imposed upon him a requirement to provide an affirmative public benefit.

¶38 First, converting Gray's property to a preferred use manifestly would have achieved the public benefit of eliminating the nonconforming use. The designation of a use as nonconforming necessarily identifies that use as detrimental to the public interest. The nonconforming use is allowed to continue only because its termination would constitute a hardship on the owner greater than the benefit the public would derive from termination of the use. *City of Seattle v. Martin*, 54 Wn.2d 541, 544, 342 P.2d 602 (1959).

¶39 Second, the City's action was coercive and confiscatory. Despite the City's declaration that any decision by Gray to sell his property would have been purely voluntary, the only reasonable inference from the comments of the city attorney is that the objective of the decision to suspend move-on permits was to force mobile home park owners to sell to developers.

¶40 I would hold that the City's unlawful use of the site plan regulation as a means to extinguish Gray's nonconforming use did not solve any genuine problem of public welfare and did not prevent any real harm to the public. Instead, the objective was to accelerate the replacement of mobile home parks by preferred uses. By suspending move-on permits as a method of forcing Gray to sell his property to a developer, the City regulated in a manner that is functionally equivalent to a classic taking in which the government ousts an owner from his domain.

[49] Clerk's Papers at 31-32.

¶41 *Guimont* calls for the court to undertake a balancing test at this point of the takings analysis, if the regulation in question "substantially advances a legitimate state interest." *Guimont*, 121 Wn.2d at 603-04. *But see Lingle*, 544 U.S. at 548 (the "substantially advances" inquiry is doctrinally and practically untenable in takings analysis). Because I do not believe the City had a legitimate interest in unlawfully terminating Gray's nonconforming use, I would say balancing is unnecessary under the test as formulated in *Guimont*. More likely, though, the *Guimont* test will be replaced by the takings analysis recently articulated by the United States Supreme Court in *Lingle*, which continues to emphasize what are known as the *Penn Central* factors, after *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). They include the regulation's economic impact on the property, the extent of the regulation's interference with investment-backed expectations, and the character of the government action. *Lingle*, 544 U.S. at 539 (*Penn Central* factors "have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules.").

¶42 The *Penn Central* factors support the conclusion that a taking occurred here. As Gray puts it, the mobile home park "was being slowly strangled by the loss of rental income from empty spaces that could not be filled."[50] Gray's unrebutted testimony was that the property "was much more valuable as a mobile home park than as land with an illegal use on it, and the sale of the property that the City was trying to force me to agree to would have been financially ruinous."[51] Denying Gray the opportunity to get new tenants to replace those who moved out frustrated his investment-backed expectation that he would be allowed to operate the park as a nonconforming use despite changes in zoning. And the character of the government action was invasive, much like a physical taking in the sense that it

---

[50] Clerk's Papers at 396-97.

[51] Clerk's Papers at 397.

was designed to oust Gray from his property so that a new owner could devote it to a use held in higher esteem by the City.

¶43 The majority asserts that Gray cannot prove economic impact because the City never actually denied a move-on permit during the period of time that the restriction was in effect. Majority at 615. But no reasonable mobile home owner would bother to apply for a permit in a park where the City had categorically declared that none would be issued.

¶44 In summary, Gray proved a regulatory taking. The judgment should be affirmed.

Reconsideration denied January 24, 2006.